**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER.,<br><br>Plaintiff,<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,<br><br>Defendants. | No. 8:26-cv-03457-PX |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ....... 1

BACKGROUND ....... 1

LEGAL STANDARD ....... 3

ARGUMENT ....... 4

I. Threshold Deficiencies Defeat Plaintiff's Claims ....... 4

A. Plaintiff lacks standing ....... 4

1. EPIC can establish no concrete injury to itself or to any member ....... 4

2. EPIC does not meet associational standing requirements ....... 7

3. EPIC is outside the Privacy Act's zone of interest ....... 10

4. EPIC lacks informational standing ....... 12

5. Plaintiff's Claims are Not Ripe. ....... 13

B. Plaintiff cannot bring a Privacy Act claim under the guise of the APA. ....... 15

C. Plaintiff's Motion Seeks Emergency Relief Under the Guise of Summary Judgment and Is Thus Procedurally Improper. ....... 17

II. Plaintiff's Claims Fail on the Merits ....... 18

A. Neither the June 8 Memorandum Nor an Abstract Decision To Create and Disclose State Citizenship Lists Is Reviewable Final Agency Action. ....... 18

1. The Alleged "Decision to Create and Disclose State Citizenship Lists" Is Not an Agency Action. ....... 19

2. The June 8 Memorandum is Not Reviewable Agency Action Because It Satisfies Neither *Bennett v. Spear* Prong. ....... 21

a. The June 8 Memorandum is a Preliminary Agency Action by DHS, Not One Marking the Consummation of any Decision-making Process. ....... 21

b. The June 8 Memorandum Fails to Satisfy *Bennett* Prong Two. ....... 24

B. The June 8 Memorandum Is Not Contrary to Law ........................................................26

1. The June 8 Memorandum Cannot Be Contrary to Law When It Describes Actions to Be Taken Only In Accordance with Applicable Law, Including the Privacy Act. ...........26

2. For similar reasons, the Social Security Act has not been violated..........................27

3. The June 8 memo provides ample legal justification .............................................28

4. Plaintiff's Proposed Relief Goes Well Beyond Appropriate Limits ........................29

CONCLUSION.......................................................................................................................30

## INTRODUCTION

On March 31, 2026, the President signed Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("Executive Order", "Order", or "E.O."). Among other things, the Order directs the Secretary of the Homeland Security to "the extent feasible and consistent with applicable law" to "compile and transmit" a State Citizenship List, consisting of "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." *Id.* § 2(a). Plaintiff challenges an internal Department of Homeland Security ("DHS") memo that it alleges creates final agency action in implementing Executive Order 14,399.

But this memo is not final agency action, as the memo outlines a deliberative process that remains ongoing that might lead to the creation and transmittal of the State Citizenship List but has not yet done so. DHS has not gone live with any such list, nor does the memo finally determine how best to implement the Executive Order in satisfaction of all legal requirements. Because Plaintiff seeks relief against agency actions that do not yet exist—and that might never exist in the form that Plaintiff speculates—Plaintiff cannot establish standing, or ripeness. "[A]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020). Accordingly, the Court should deny Plaintiff's motion for partial summary judgment.

## BACKGROUND

### Executive Order 14,399

On March 31, 2026, President Trump issued Executive Order 14,399. This Executive Order is an intra-Executive Branch directive from the President to his subordinates. As relevant here, the Order does the following:

**State Citizenship Lists.** First, the Order directs the "Secretary of Homeland Security . . . in coordination with the Commissioner of [the Social Security Administration]" to "the extent feasible and consistent with applicable law" to "compile and transmit" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." E.O. § 2(a). "The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* Additionally, "[t]he Secretary of Homeland Security shall establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." *Id.*

The Order also directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" "within 90 days of the date" of the Order, which was by June 29, 2026. *Id.* § 4(c). The Secretary of Homeland Security, the SSA Commissioner, and the Secretary of Commerce are charged with coordinating to implement the State Citizenship Lists. *Id.* § 4(a). The State Citizenship List "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election." *Id.* § 2(a).

The Order does not specify any particular purpose or intended use for the State Citizenship Lists, and (other than their creation by DHS and transmission to States) does not require anyone inside or outside of the federal government to do anything with those lists. As of this filing, none of the "infrastructure" contemplated by Section 4(c) of the Order has been created. *See, e.g.,* Decl. of Jessica Burns MacBride ("MacBride Decl."); Decl. of Michael X. Mayhew ("Mayhew Decl.").

**The June 8 memo.** On June 8, 2026, consistent with the E.O., the Secretary of Homeland Security approved an internal memorandum (June 8 Memo) adopting USCIS's then-current plan for carrying out Section 2(a) of the E.O. Memorandum dated June 8, 2026 from Joseph B. Edlow titled "Executive Order 14399 Implementation", ECF No. 7-3 ("June 8 memo"). The Memo

contemplates a two-step approach: creation of a secure, federated Portal, followed by production of consolidated outputs derived from data that federal agencies already maintain. As described, the Portal would allow authorized state election officials to download citizenship-related outputs from USCIS, SSA, and the Department of State ("State"), subject to agency-specific terms of service and disclaimers. June 8 Memo at 2. These outputs contain data such as name, date of birth, and agency-specific identifiers already used within each system. June 8 memo at 2. The June 8 Memo reflects ongoing interagency coordination and deliberation. The June 8 memo also acknowledges that the E.O. contemplates a citizen-facing transparency feature, but explains that USCIS determined such a public-facing portal could not be completed by the E.O.'s initial target dates. *Id.* at 3. As a result, DHS sequenced the citizen-access functionality for later in 2026 while continuing preparatory steps necessary for interagency and state-facing components. *Id.*

On June 25, 2026, in a case brought by a group of states, a district court in Massachusetts enjoined implementation of certain portions of the E.O. as to the Plaintiff States with respect to elections occurring on or before November 3, 2026. That injunction was stayed on August 24, 2026 by the Supreme Court in *Trump v. California,* 609 U.S. ___, 2026 WL 2473573 (Aug. 24, 2026). This litigation followed shortly thereafter. On August 31, 2026, Plaintiff filed its complaint, alleging, *inter alia,* violations of the Administrative Procedure Act ("APA"), based on underlying violations of the Privacy Act and the Social Security Act. Complaint, ECF No. 1 ("Compl."). On September 3, 2026, Plaintiff filed its Motion for Partial Summary Judgment on Counts I through IV of the Complaint, ECF No. 7, and Memorandum in Support of its Motion, ECF No. 7-1 ("Pl.'s Mem.").

## LEGAL STANDARD

When agency action is challenged under the APA, summary judgment "serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, an agency action may not be set aside unless it is "arbitrary," "capricious," or "not in accordance

with law." 5 U.S.C. § 706(2)(A). The scope of review is "narrow," *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020), *as amended* (Jan. 14, 2020), and "highly deferential," with a presumption that the agency decision is valid, *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 114 (D. Md. 2019).

"[A] court is not to substitute its judgment for that of the agency," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), but instead serves to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Id*. (citation omitted).

## ARGUMENT

Plaintiff's motion for summary judgment—initiated three days after the filing of Plaintiff's complaint—is premature. Because Plaintiff seeks relief against agency actions that do not yet exist—and that might never exist in the form that Plaintiff speculates—Plaintiff cannot establish standing, ripeness, or final agency action subject to review under the APA. For these reasons, the Court should deny summary judgment to Plaintiff.

### I. Threshold Deficiencies Defeat Plaintiff's Claims

#### A. Plaintiff lacks standing

##### 1. EPIC can establish no concrete injury to itself or to any member

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs cannot satisfy these basic prerequisites for judicial review.

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2)

(emphasis omitted). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."). In addition, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (citation omitted).

Plaintiff claims standing based on alleged injuries resulting from the June 8 memo. Pl.'s Mem. at 21-22. But ultimately, Plaintiff's real concern is not with the June 8 memo itself. Instead, Plaintiff fears the possible future creation and dissemination of State Citizenship Lists by DHS (assuming creation of such a list turns out to be "feasible" and "consistent with applicable law," E.O. § 2(a)). But DHS has not yet disseminated any such State Citizenship lists to states. Mayhew Decl. ¶ 12. Thus, any alleged injury based on the possibility of future agency action on the implementation of E.O. § 2(a) remains hypothetical and far "too speculative for Article III purposes". *Clapper*, 568 U.S. at 409. Notwithstanding the June 8 memo, it remains unknown how the agencies referenced in the Order will ultimately implement it, or on what timeline, or under what parameters, or using what processes. Indeed, the relevant agencies *themselves* are still "working to develop new technical infrastructure, including building out the capability to deliver DHS citizenship data to state election officials" and "no implementation date has been set." Mayhew Decl. ¶ 10 .

That genuine and ongoing uncertainty is fatal to any theory of standing that relies on predictions about possible future agency actions. By the same token, the disconnect between

Plaintiff's complaint and its possible future injuries (which would stem, if at all, from future implementation actions) also gives rise to an independently fatal causation (or traceability) problem. In short, "the source of any injury to the plaintiffs is the action that the [government] *might* take in the future to" implement the Executive Order and the June 8 memo—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).

The Supreme Court's recent opinion in *Trump v. California,* 2026 WL 2473573, is dispositive on the matter. That case involves a challenge brought by a group of states in which the Court specifically considered Section 2(a) of the same executive order at issue here. The Court held that Plaintiffs lacked standing, as any injury relied on a "long chain of inferences." *Id*. at *2 (citation omitted), and that any harm flowing from Section 2(a) involved "hypothetical future harm" that was far from "certainly impending." *Id.* at *3 (*citing Clapper*, 568 U.S., at 416).

Such harm was hypothetical because any injury to the States would stem from "the downstream action that the Secretary "'might take in the future' to implement §2(a)." *Id.* at *2 (quoting *Trump v. New York,* 592 U.S. at 133-34). And as the Court noted, it is unknown whether it would be feasible "for the Secretary to create and transmit the [Citizenship] Lists before the midterms." *Id.* Or whether Section 2(a) will "prove feasible to implement in any manner whatsoever[,]" *id.* (quoting *Trump v. New York,* 592 U.S. at 132), or in a manner "consistent with applicable law." *Id.* (quoting 91 Fed. Reg. 17,125). Given all this, "'[a]ny prediction how the Executive Branch might eventually implement' §2(a) while balancing feasibility and lawfulness 'is "no more than conjecture" at this time.'" *Id.* (quoting *Trump v. New York,* 592 U.S. at 131).

So too with this Plaintiff. Any alleged injury is based on hypothetical harm from actions the Secretary may or may not take "in the future to implement §2(a)." *Id.* The June 8 memo does

not implement that section, it merely sets forth the agency's then-current plans for intended future implementation Any alleged injury based on these future actions the Secretary may take to implement that memo thus relies on a "long chain of inferences," *id.*, that lacks concreteness. "And without concrete harm, there is no standing." *Id.*

Ultimately, whether considered a problem of injury or causation, put simply, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013). That is true even where (as here) the contours of that possible future regulation or other agency action are generally laid out in an [internal] agency memo, even "using a specific timeline," especially where the agency has already explained that the timeline will be altered and any implementation date remains unknown. *Id*. In the interim, Plaintiff's rights are not impaired by an inchoate policymaking process that is not yet completed.

**2. EPIC does not meet associational standing requirements**

EPIC argues that it can assert standing as a "representative of its members if (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Pl.'s Mem. at 22. But, as discussed, EPIC's members do not have individual standing because all the alleged injuries are hypothetical, and none is concrete.

As for the specific injuries that EPIC claims its members are suffering, Plaintiff analogizes the privacy injuries caused to its members to the common law torts of intrusion upon seclusion, and breach of confidence. *Id.* at 22-23. But those torts involve disclosures to the public, which have not occurred here. In this case, the information portal that Plaintiffs claim would result in

these alleged torts has not been created. As for voting-related injuries, any such alleged injuries are caused, or would be caused, by state or local officials' independent decisions to remove individuals from the voter rolls; they are not caused by the federal government. *Id.* at 25-26. Plaintiff cannot establish standing unless they can show that the injuries were likely "caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. But where, as here, the claimed injury "hinges on the response of [a] third party to the government action," standing is "substantially more difficult to establish." *Id.* at 382-383.

Finally, EPIC claims reputational injuries based on a putative fear that its members will be subject to "false statements" such as "being falsely characterized as a non-citizen." Pl.'s Mem. at 24. Plaintiff likens this to the "harm associated with the tort of defamation." *Id*. But, as discussed throughout, such harms are speculative and cannot support standing.

EPIC offers two individual declarants to support its associational standing claims. But those individuals cannot establish standing on their own, let alone on behalf of EPIC. Both declarants raise concerns about future, hypothetical injury. Ms. Kisselburgh, for example, states that she "did not consent" to DHS, SSA, or State disclosing her personal information "to construct state citizenship lists . . ." Decl. of Lorraine Kisselburgh ¶¶ 18-20, ECF No. 7-30 ("Kisselburgh Decl."). She further states that the "sharing of my private information without my knowledge, expectation, or consent is highly intrusive and offensive and makes me concerned and even angry …" *Id.* at 21. But, of course, Ms. Kisselburgh never alleges—and could not allege— that her personal information was disclosed, nor that she experienced any negative effect on her ability to vote, nor that she was subjected to false characterizations. Instead, Ms. Kisselburgh complains of purely hypothetical future injury. Moreover, Ms. Kisselburgh's allegations are no more than a generalized grievance, the impact of which "is plainly undifferentiated and common to all

members of the public," and which cannot establish a particularized injury. *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (citation omitted). Such speculative injury cannot support standing. The same holds true for Mr. Nel, EPIC's other individual injury declarant. Mr. Nel alleges the same privacy injuries alleged by Declarant Kisselburgh. Again, these are hypothetical rather than present or ongoing injury. Mr. Nel claims that, in late 2025, DHS's SAVE system erroneously designated him a non-citizen, causing his temporary removal from his local county's voter rolls. Decl. of Anthony Nel ¶¶ 14-20, ECF No. 7-31 ("Nel Decl."). Mr. Nel's voter registration was reinstated early in 2026 after providing proof of citizenship. *Id.* ¶ 28. On this basis and based on a fear that he will again be mistakenly designated, Mr. Nel alleges privacy, reputational and voting-related injuries, *see* Pl.'s Mem. at 23-26.

But mere fear of future injury is insufficient for standing. Standing for prospective relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence. What matters is the '*reality* of the threat of repeated injury,' not 'subjective apprehensions.'" *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (mem) (Kavanaugh, J., concurring in grant of application for stay) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 107 (1983)) (emphasis in original). What Mr. Nel alleges here relies on a "speculative chain of possibilities," *Clapper*, 568 U.S. 398, 409-10 (2013) (emphasis omitted), that, based on a program that is not operational, his personal data will be disclosed and that, as a result, he will be identified as a non-citizen and removed from voter rolls by local officials. Such speculation is even more unlikely based on Mr. Nel's allegation that he provided citizenship information and thus apparently corrected whatever deficiency previously existed. The mere (unlikely) possibility that the same problem could recur cannot provide a basis for prospective relief. And, in any event, the June 8 memo takes no action whatsoever with respect to Mr. Nel's voter registration or voter eligibility, and even the possible future State Citizenship

Lists contemplated by the Executive Order would not themselves alter anyone's eligibility to vote. And to the extent some *State* eventually takes some downstream action that affects Mr. Nel's ability to vote—an entirely speculative possibility that Plaintiffs has not established—that would at most be a basis for suing that State. *See, e.g., FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367, 382 (2024).

**3. EPIC is outside the Privacy Act's zone of interest**

Even assuming that Plaintiff's Privacy Act claims of injury could survive the arguments set forth above, they are indisputably precluded by both the Privacy Act and the APA. Plaintiff lacks standing because it is outside the Privacy Act's zone-of-interests. The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of all causes of action, not just congressionally authorized causes of action under the APA or other statutes. As the Supreme Court has made clear, the zone-of-interests test "is a 'requirement of general application'" that "always applies and is never negated[.]" See *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)). Indeed, the zone-of-interests test indisputably applies to claims brought under the APA. See *Lexmark*, 527 U.S. at 129 (citing *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150 (1970)); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). And this court has affirmed that, "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit,'" suit is foreclosed. *Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 807 (2025) (quoting *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225).

Here, the "[t]he relevant statute" for zone-of-interests purposes "is the statute whose violation is the gravamen of the complaint," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990), as confirmed "by reference to the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76; *see Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) ("we look to whether [the plaintiffs] fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the INA"); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1366 (D.C. Cir. 1990) (applying zone-of-interests test to the substantive statute under which the agency acted where the plaintiff claimed the agency lacked statutory authority for the challenged program). That statute is indisputably the Privacy Act. *See* Am. Compl., ¶¶ 74, 78, 99, 106, 129, 134, 137, 138. But the Privacy Act's purposes are all focused on protection of *individual* privacy rights, *i.e.*, "to 'protect the privacy of *individuals* identified in information systems maintained by Federal agencies.'" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 722-23 (D. Md. 2025), *vacated and remanded*, 172 F.4th 361 (4th Cir. 2026) (internal citations omitted) (emphasis added).

Although ordinarily the zone of interests is easily met, *Maryland*, *supra*, this is the precise situation where it cannot be met, because the statute is explicit that Congress intended to preclude suit from this kind of plaintiff. The Privacy Act provides no right to relief to any plaintiff other than an "individual" as that term is defined in the statute. 5 U.S.C. §§ 552a(g)(1)(D) ("Whenever any agency fails to comply with any other provision . . . the *individual* may bring a civil action against the agency" (emphasis added)); (a)(2) ("[T]he term 'individual' means a citizen of the United States or an alien lawfully admitted for permanent residence."). EPIC – the only plaintiff in this suit – is an organization, not an individual. Nor does it matter that EPIC is allegedly a membership organization. None of EPIC's members is a plaintiff, and EPIC cannot stand in for

them where the statute precludes organizations from suing. Because Congress only permitted "individuals" to vindicate rights under the Privacy Act, EPIC is indisputably outside that statute's zone of interest, and lacks standing to bring suit.

**4. EPIC lacks informational standing**

Plaintiff also claims to have standing based on "informational" injury. But that argument fails. In order to establish informational standing, a plaintiff must show that "'(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *EPIC v. Pres. Adv. Comm. on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016) ("judgment of Congress" is "important" to "whether an intangible harm," including informational harm, "constitutes injury in fact").

EPIC fails both prongs. It has not been deprived of information that the Privacy Act requires to be provided to it. To the contrary, the Privacy Act provides actionable rights only to individuals. S*ee., e.g*., 5 U.S.C. 552a(d) (providing right of access to individuals for information "pertaining to him."). It thus fails the first prong of the test. With respect to the second prong, the underlying purpose of the statute must be to provide information. "Unlike FOIA, the Privacy Act's primary purpose is not disclosure." *Palmieri v. United States*, 194 F. Supp. 3d 12, 17 (D.D.C. 2016), quoting *Blazy v. Tenet,* 194 F.3d 90, 96 (D.C.Cir.1999). Rather, the Privacy Act aims to "safeguard[ ] the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records. It does so by allowing an individual to participate in ensuring that his records are accurate and properly used, and by imposing

responsibilities on federal agencies to maintain their records accurately." *Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C.Cir.1984) (footnote omitted). *See also Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 722-23 (D. Md. 2025) (citation omitted), *vacated and remanded*, 172 F.4th 361 (4th Cir. 2026) (observing that the Privacy Act's purposes focus on protection of individuals' privacy rights). Accordingly, Plaintiff cannot claim an injury based on an alleged failure to get "information that the Privacy Act requires agencies to disclose," Pl.'s Mem. at 26, since that is the primary purpose of the Privacy Act in general, and certainly not for non-individuals such as EPIC. Thus, EPIC fails to establish informational standing.

**5. Plaintiff's Claims are Not Ripe.**

Plaintiff's claims independently fail because they are not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). The ripeness doctrine forbids federal courts from adjudicating "disputes that are 'dependent on "contingent future events that may not occur as anticipated or indeed may not occur at all."'" *Trump v. California*, 2026 WL 2473573 at *2. Courts typically consider both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys*, 387 U.S. at 149.

This case rests on contingent future events because implementation of the E.O.'s Section 2(a) has not yet occurred. *See* Mayhew Decl. And Defendants represented to Plaintiff that the "citizenship list" portal was *not* in fact going live on September 4 and agreed to give Plaintiff 48-hours advance notice before any portal did go live. Thus, Plaintiff's claims are unripe.

*Trump v. California*, discussed above, is dispositive. That opinion analyzed Section 2(a) of the E.O. and determined that any injury claims based on its directives were hypothetical and based on unknown factors. 2026 WL 2473573 at *2-3. For similar reasons, Plaintiff's claims emerging from that same E.O. section are unripe as they are based on predictions as to "'how the Executive Branch might eventually implement' §2(a) while balancing feasibility and lawfulness." *Id.* at *2.

Under these circumstances, "[l]etting the Executive Branch's decisionmaking process run its course" would "bring[] 'more manageable proportions' to the scope of the parties' dispute[.]" *Trump v. New York,* 592 U.S. 125, 134 (2025) (quoting *Lujan*, 497 U.S. at 891); *see also, e.g.*, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (asking whether "consideration of the issue would benefit from a more concrete setting" (citation omitted)). "And in the meantime, the plaintiff[] suffer[s] no concrete harm from the challenged policy itself, which does not require [it] 'to do anything or to refrain from doing anything'" at all. *Trump v. New York*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

If any agency takes some final action to implement the Executive Order in a way that causes any actual (or imminent) concrete injury to Plaintiffs, they can sue then. But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Id.* at 131. And "[f]ederal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." *Devia*, 492 F.3d at 424-25 (citation omitted); *see also, e.g.*, *Nat'l Urb. League*,

783 F. Supp. 3d at 79. This litigation should thus be dismissed as unripe—without prejudice—in its entirety.

**B. Plaintiff cannot bring a Privacy Act claim under the guise of the APA.**

The Privacy Act contains a comprehensive remedial scheme for violations of its provisions. *See* 5 U.S.C. § 552a(g). For two types of violations—refusals to amend records or to provide access to records—the Act authorizes prospective relief. *See id.* For all other violations, the Act authorizes only damages, and only if the violation was intentional or willful. *See id.* § 552a(g)(4). Because the violations alleged here fall in the latter, catchall category, the Act does not authorize prospective relief.

Plaintiff styles its Privacy Act-based claims as violations of the APA. *See* Compl. ¶¶ 150-165. But "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175-76 (4th Cir. 2025), *abrogated on other grounds by AFL-CIO v. SSA*, 172 F.4th 361 (4th Cir. 2026) (en banc). Plaintiff may not invoke the general right of action conferred by the APA to evade the restrictions imposed by the Privacy Act's specific remedial scheme.

In statutory interpretation, "the specific governs the general," and where "a general authorization and a more limited, specific authorization exist side-by-side," "[t]he terms of the specific authorization must be complied with." *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U.S. 639, 645-46 (2012). Otherwise, the "specific provision [would be] swallowed by the general one, 'violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *Id.* At 64. (alterations omitted). As a result, "a precisely drawn, detailed statute pre-empts more general remedies." *Hinck* v. *United States*, 550 U.S. 501, 506 (2007).

Consistent with that principle, the Supreme Court has repeatedly held that plaintiffs may not use the APA "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 215 (2012). For instance, a plaintiff may not use the APA to end-run a specific statute's limits on who may sue, *see Block* v. *Cmty. Nutrition Inst.*, 467 U.S. 340, 345-348 (1984); its exhaustion requirement, *see ibid.*; or its limitations period, *see Block* v. *North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 n.22 (1983). By the same logic, respondents may not invoke the APA here to end-run the Privacy Act's limits on the available relief.

Confirming that conclusion, the APA does not authorize review where other "statutes preclude judicial review[,]" 5 U.S.C. § 701(a)(1), or where "any other statute * * * expressly or impliedly forbids the relief which is sought," *id.* § 702. The Privacy Act "impliedly forbids the relief which is sought" here, *id.*, because it explicitly authorizes prospective relief for only two specific categories of violations, *see id.* § 552a(g)(2)-(3), and thus necessarily denies authorization for prospective relief for other categories.

The same conclusion follows from the provisions stating that the APA permits review only of final agency action "for which there is no other adequate remedy in a court," *id.* § 704, and that a plaintiff may sue under the APA only if "the special statutory review proceeding relevant to the subject matter" is "inadequa[te]," *id.* § 703. The Privacy Act provides an adequate remedy: It expressly authorizes damages if the plaintiff can show that the violation was "intentional or willful." *Id.* § 552a(g)(4). Damages are the classic example of an adequate remedy at law that forecloses equitable relief. *See*, *e.g.*, *Schoenthal* v. *Irving Tr. Co.*, 287 U.S. 92, 95 (1932). And damages are the traditional remedy for the privacy torts to which Plaintiff analogized the Privacy Act violations here. In any event, the Privacy Act's reticulated remedial scheme reflects

Congress's own judgment about what remedies are adequate for Privacy Act violations, and courts cannot second-guess that legislative choice through the APA.[1]

**C. Plaintiff's Motion Seeks Emergency Relief Under the Guise of Summary Judgment and Is Thus Procedurally Improper.**

Plaintiff filed its motion for partial summary judgment only a few days after filing its complaint in a case where the federal rules afford the government 60 days in which to investigate the facts and respond to the complaint. *See* Fed. R. Civ. P. 12(a)(2). Plaintiff then sought, and was granted, an expedited briefing schedule, allowing Defendants less than a week to respond.

As this accelerated schedule indicates, Plaintiff is seeking emergency relief without complying with the requirements associated with such relief, most notably imminent and irreparable injury. If Plaintiff desired emergency relief, Plaintiff should have moved for a preliminary injunction under Fed. R. Civ. P. 65. Such motions, unlike the instant motion, turn significantly on questions of irreparable harm, and the other applicable Rule 65 factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008) (the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely [] succe[ss] on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "[a] balance of [the] equities [] in [its] favor"; and (4) "[accord with] the public interest."). That Plaintiff barely addresses such factors, and only in a footnote, *see* Pl.'s Mem. at 29, n. 8, indicates its lack of conviction as to its likelihood of success on a true motion for emergency injunctive relief.

---

[1] *Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006), cited by Plaintiff in a footnote to support its use of an APA claim for an underlying Privacy Act violation, Pls. Mem. at 10 n.4, is inapt as that case was not brought under the APA but directly under the Privacy Act. *Doe* does not substantively address the APA except in passing in a footnote of its own. *Doe, 435* F.3d at 505 n.17.

Moreover, if the Court grants Plaintiff's motion for summary judgment in whole or in part, the Court should provide Defendants with clear notice of whether it intends any relief to take immediate effect. [2]A motion for partial summary judgment seeks "a pre-trial adjudication that certain issues are established for trial of the case," not a final judgment. *FDIC v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994). An order granting a motion for partial summary judgment is "subject to revision by the district court and has no *res judicata* effect." *Id*. But given that Plaintiff seeks in effect a preliminary injunction, Defendants respectfully request that the Court make clear the scope and immediate effect of any order to preserve their procedural rights with respect to it.

## II. Plaintiff's Claims Fail on the Merits

### A. Neither the June 8 Memorandum Nor an Abstract Decision To Create and Disclose State Citizenship Lists Is Reviewable Final Agency Action.

Plaintiff fails to satisfy the essential elements of their APA claims because the Complaint does not petition for judicial review of a reviewable agency action. Rather, Plaintiff challenges an internal memorandum signed by one of the defendant agencies on June 8 that is not the consummation of any relevant decision-making process nor itself establishes a direct and immediate effect on the day-to-day business of the Plaintiff. And Plaintiff's challenge to an abstract decision to attempt to create and disclose state citizenship lists is not an agency action, as defined by the APA, let alone a final agency action.

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts. A petitioner must seek judicial review of an "agency action" that must be

"final." In this case, the Complaint petitions for review of (1) an Implementation Memo signed by Secretary Mullin on June 8, 2026, and (2) "Defendants' decision to create and disclose State Citizenship Lists." Compl. ¶ 132. The Memorandum satisfies neither *Bennett v. Spear* finality prong, the "defendants" collectively have made so susch decision and the June 8 Memo is accordingly not an agency action.

**1. The Alleged "Decision to Create and Disclose State Citizenship Lists" Is Not an Agency Action.**

Start with the alleged abstract "decision to create and disclose State Citizenship Lists and associated information[.]" *See* Compl. ¶ 132. Under § 706(2), a plaintiff may not seek review of an "abstract decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, only "specific agency action, as defined in the APA," is subject to judicial review. *See Id*. The APA defines the term "agency action" to include a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). The Act further defines each of these terms. *Id.* § 551(4), (6), (8), (10), (11).

The term "agency action" "does not provide review for everything done by an agency." *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (quoting *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Rather, the "term is similar in concept to the meaning of 'final decision' as used in describing the appealability of court orders." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). Even if construed expansively, the APA's definition of "agency action" does not encompass (1) the mental processes or abstract plans of an agency head or (2) other abstract policy decisions divorced from the vehicles through which an agency conveys a substantive decision.

Plaintiffs' § 702(2) claim for review of an abstract "decision to create and disclose State Citizenship Lists and associated information" violates the last of these two categories. As the

Supreme Court confirmed in *Biden v. Texas*, an "agency action" is the vehicle through which an agency conveys a substantive decision either during or at the conclusion of an agency proceeding, not an "abstract" policy decision. 597 U.S. at 809. Agency actions are judged by courts on whether they are supported by "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv. Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). Because a central goal of APA review is to determine whether a specific agency action rests on an adequate rationale, challenges to agency action under the APA do not—indeed, could not—separate out for review an agency's disembodied substantive "decision" from the vehicle through which the decision is conveyed and explained. *Biden*, 597 U.S. at 809.

In fact, the opposite is true: § 706(2) review necessarily focuses simultaneously on the vehicle in which an agency decision is delivered and the reasoning expressed in that vehicle. *Id.* Particularly for arbitrary-and-capricious review, the soundness of the agency's reasoning is what counts. *See, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 426 (2021) (considering whether "in particular" the agency has "reasonably considered the relevant issues and reasonably explained the decision" and determining that the agency's "analysis" in the agency action "was reasonable and reasonably explained").

The Complaint's petition for § 706(2) judicial review of a "decision to create and disclose State Citizenship Lists and associated information[,]" Compl. ¶ 132, is precisely the type of "abstract decision apart from specific agency action, as defined in the APA," that § 706(2) does not subject to judicial review, *see Biden*, 597 U.S. at 809. Plaintiffs claim that the Court should hold unlawful and set aside this abstract decision does not state a claim under 5 U.S.C. § 706(2). *See Mayor and City Council of Baltimore v. CFPB*, 775 F. Supp. 3d 921, 938 (D. Md. 2025) (rejecting "challenge" to "a disembodied and unrealized decision"); *Bark v. U.S. Forest Serv.*, 37

F. Supp. 3d 41, 50 (D.D.C. 2014) ("Plaintiffs point to no written rules, orders, or even guidance documents of the Forest Service that set forth the supposed policies challenged here. Instead, Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices. But a final agency action requires more.").

**2. The June 8 Memorandum is Not Reviewable Agency Action Because It Satisfies Neither *Bennett v. Spear* Prong.**

The June 8 Memorandum is not a "final" or reviewable agency action. To be reviewable, an agency action must satisfy two conditions. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett*, 520 U.S. at 177-78 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 178 (citation omitted). Neither of the two prongs are satisfied here.

**a. The June 8 Memorandum is a Preliminary Agency Action by DHS, Not One Marking the Consummation of any Decision-making Process.**

Plaintiff fails to establish that the June 8 Memorandum marks the consummation of the DHS' decision-making process in this area. Its only argument is that it the Memorandum "is formally signed by [the] Secretary" and is a "formal approval" of something. Pl.'s Mem. at 8-9. But a multitude of preliminary agency actions may also be formally signed and approved by an agency head. In *Chicago & Southern Air Lines v. Waterman*, 333 U.S. 103, 112-13 (1948), the Supreme Court held that a formalized agency order by the Civil Aeronautics Board did not mark the consummation of the administrative process. And in *Georater Corp. v. EEOC*, 592 F.2d 765,

768 (4th Cir. 1979), the court found that a plaintiff's "reliance on the form of the determination is misplaced." Rather, the issue is whether the document is "preparatory to further proceedings." *Id.*

The June 8 Memorandum is undoubtedly preparatory to further proceedings, especially as to the privacy issues Plaintiff raises. For example, the memorandum explains that "[a]pplicable privacy offices and counsel are coordinating to ensure that . . . States' use, retention, and redisclosure of the information" at issue would be "constrained through appropriate agreements and terms of service, and that the portal's operations align with existing legal authorities and published SORNs and PIAs, supplemented as needed[.]" June 8 Memo at 3. The memorandum thus assigns to future agency action the very issues Plaintiff wants to litigate now. Indeed, the Memorandum is explicit that it "lays a foundation for *future* enhancements that can further strengthen election related integrity and transparency." *Id.* at 5 (emphasis added).

Moreover, the Memorandum incorporates by reference the Executive Order's requirement that any further implementation may occur only "to the extent . . . consistent with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. § 552a)." *Id.* at 2. Indeed, many of the further events contemplated by the June 8 memorandum have indisputably not occurred. For example, the Memorandum contemplates a "technological mechanism that should be delivered on or around June 30, 2026" providing "a digital portal mechanism for States to access and download" certain "citizenship list information[.]" *Id.* at 2. But as represented to Plaintiff before it filed its motion, and as Plaintiff does not and cannot dispute, there is no live "portal". The memorandum leaves significant uncertainty about whether, when, and in what form implementation might occur in the future.

As a result, until that "necessary" "infrastructure" has been erected, the State Citizenship Lists referenced in the memorandum remain hypothetical and inchoate. This is supported by the

lack of existence of any tangible list or portal at this time.. Similarly, the President explicitly directed DHS to "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." E.O. § 2(a). Again, until those "procedures" have been designed and implemented, it is impossible to know whether they will mitigate or resolve some or all of Plaintiff's concerns. What is clear is that the memorandum is a preliminary DHS action.

Section 2(a) explicitly applies only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." *Id.* § 2(a). The Memorandum explicitly states that whatever structure results is meant to preserve "agency control over its own data" while allowing "state officials to determine how to use this information." *Id.* at 2. The Memorandum is devoid of any clear implementation or enforcement mechanism. In heeding the President's explicit directive to consider the possible applicability of the Privacy Act, perhaps the agencies will *agree* with Plaintiffs about the need for (or at least the prudence of) an amendment to the relevant SORNs to explicitly identify this as a new "routine use." But as of this filing, it is not even clear whether or when these lists will be created despite conflicting timelines which have yet to materialize—much less in what form, based on what data, or how they might be used. Were DHS to determine that a new SORN is required, that is a process that requires public notice, and (at least) a 30-day comment period—in which Plaintiffs and others may submit their views to the agency on many of the topics addressed in their briefs. *See* 5 U.S.C. § 552a(e)(4), (e)(11). Such a comment process would resolve a significant portion of Plaintiff's Privacy Act-related arguments. Importantly, these sorts of unresolved contingencies make clear that there is currently no final agency action for this Court to review.

While the Plaintiff points to several alleged inaccuracies in DHS's "Systematic Alien Verification for Entitlements" or "SAVE" system—they cannot explain the extent to which SAVE data will feature in the possible future creation of these State Citizenship Lists or, if so, how it will be used. And again, even if SAVE is one of the databases that is in some way involved in this process, the use of other (as-yet-unidentified) "relevant federal databases" could mitigate or resolve Plaintiff's concerns. In any event, before any of these "infrastructure" decisions have been made, there is nothing for Plaintiff to challenge (and nothing for this Court to review). That is fatal to Plaintiff's theory of final agency action.

**b. The June 8 Memorandum Fails to Satisfy *Bennett* Prong Two.**

Plaintiff fails to show that the June 8 Memorandum satisfies *Bennett*'s second prong. Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted) (alteration in original)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). Moreover, courts consider "events" after the agency action was issued "to determine whether the agency has applied [it] as if it were [a] binding" document. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014).

Plaintiff fails to meet any of these criteria. The memorandum itself does not impose any legal obligations on the Plaintiff. Plaintiff submits a declaration from a member, Anthony Nel, ECF No. 7-31, who complains that his Texas county removed him from the voter rolls in late 2025 and reinstated him in February 2026, more than four months before the June 8 Memorandum was executed. Nel Decl. ¶¶ 13-28. Events predating the June 8 Memorandum by four months fail to show that the June 8 memorandum had a direct and immediate effect on Mr. Nel. In any event, courts look to whether a plaintiff faces any "risk of significant civil and criminal . . . penalties" for failing to comply with a challenged agency action. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019). And the June 8 Memorandum results in nothing like that type of consequence. "[I]f the practical effect of the agency action is not a *certain* change in the legal obligations of a party, the action is non-final for the purposes of judicial review" under the APA. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (emphasis added) (citation omitted).

Nor does the Memorandum impose obligations on the agencies. *See Bennett*, 520 U.S. at 178. In *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-243-TDC, 2026 WL 280089 (D. Md., Feb. 3, 2026), the court held that a DHS memorandum that provided enforcement guidance satisfied the second prong because it determined the "rights or obligations" of immigration officers, *Philadelphia Yearly*, 2026 WL 280089 at *3 (quoting *Bennett*, 520 U.S. at 178). But this is the only court in this circuit to have found such an obligation with respect to that particular memorandum, and no other case law in the Fourth Circuit supports this interpretation. In any event, the memorandum at issue here does not provide any dictates to the agencies. It refers throughout to an "approach" that it seeks approval for and outlines general guidelines but provides few concrete details on how to implement said approach. *See* June 8

Memo. By signing the Memorandum, the Secretary did not create a "certain change in the legal obligations" of DHS, nor could the Secretary bind the agencies referenced. *Ctr. For Auto Safety*, 452 F.3d at 811.

"[E]vents" after the June 8 Memo was issued confirm that DHS has not "applied [it] as if it were [a] binding" document. *See Nat'l Mining*, 758 F.3d at 253. For example, the memorandum refers to a technological mechanism that "should be delivered on or around June 30, 2026," June 8 Memo at 2, but it is now September 10, 2026, and no such technological mechanism has been delivered. Plaintiff's baseless assertion that the "Implementation Memo commits the DHS Defendants" to anything in a binding manner as contemplated by *Bennett* prong two is thus demonstrably incorrect. *See* Pl.'s Mem. at 9.

Nothing is certain about the effect (if any) of whatever actions (if any) the federal government will take to produce lists that do not yet exist—and that might never exist in the form that Plaintiff assumes. And even if they do, States may ignore them or use them for purposes that are plainly lawful—such as post-election law-enforcement activity relating to unlawful voting. Plaintiff has not, and cannot, show the Memorandum constitutes final agency action.

### B. The June 8 Memorandum Is Not Contrary to Law

#### 1. The June 8 Memorandum Cannot Be Contrary to Law When It Describes Actions to Be Taken Only In Accordance with Applicable Law, Including the Privacy Act.

Plaintiff's facial challenge to the June 8 Memorandum fails because it relies on characterizations of the Memorandum that are inconsistent with its terms. The Memorandum explicitly incorporates by reference Executive Order 14,399's directive that actions "must be done" only "consistent with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. § 552a)." June 8 Memo at 2. Definitionally, guiding subordinates to take further action

only to the extent *consistent with applicable law* cannot be interpreted as a directive to violate that law. It is plainly lawful for an agency head to provide guidance to his subordinates to develop a course of action within the agency's statutory authorities to implement the President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

Plaintiff's claims entirely fail to grapple with this problem. For example, Plaintiff complains about language in the memorandum speculating that Defendants might be able to "comply with the Privacy Act by relying on 'existing' SORNS" insofar as they already "permit USCIS, SSA, and DOS to disclose citizenship data for the purpose of creating the State Citizenship Lists." Pl.'s Mem. at 12. And Plaintiff complains that "as of the time of this filing, no operative SORNs permit these routine uses, and no SORNs include DHS compiling citizenship data from SSA and DOS for voter verification purposes[.]" *Id.* at 12. While plaintiffs engage in pure speculation about the availability of existing SORNs, what is undeniably true as of the time of Plaintiff's Complaint and this filing, is that the June 8 Memo has resulted in no final agency action. "In the event that the Department [of Homeland Security or any other agency] does so," in alleged violation of the Privacy Act, Plaintiff "may seek relief through an as-applied challenge." *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 446 (D.C. Cir. 2012).

**2. For similar reasons, the Social Security Act has not been violated**

Just as Plaintiff's Privacy Act-based claims fail, so too do its claims based on the Social Security Act. SSA has not disclosed records to DHS or to state election officials pursuant to the

E.O. *See* Compl. ¶ 147; MacBride Decl. ¶ 6. And as discussed above, Plaintiff has no standing to sue over concerns of future speculative disclosures.

**3. The June 8 memo provides ample legal justification**

Plaintiff contends that DHS lacks the statutory authority to implement Section 2 of the Executive Order as discussed in the June 8 memo. But 8 U.S.C. § 1373 provides this authority. The June 8 memo does nothing more than provide an infrastructure to share immigration status information, and Section 1373 allows DHS to "send and receive immigration status information with federal, state, and local government entities…" June 8 Memo.

Section 1373 consists of three subsections. Section 1373(a) provides that, "[n]otwithstanding any other provision" of law, a "government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status * * * of any individual." 8 U.S.C. § 1373(a). Section 1373(b), captioned "Additional authority of government entities," provides that, "[n]otwithstanding any other provision" of law, "no person or agency may prohibit, or in any way restrict," a government entity from sending, requesting, exchanging, or maintaining "information regarding the immigration status * * * of any individual[.]" 8 U.S.C. § 1373(b). Finally, Section 1373(c), captioned "Obligation to respond to inquiries," provides that DHS "shall respond to an inquiry" by a State "seeking to verify or ascertain the citizenship or immigration status of any individual within [its] jurisdiction * * * by providing the requested verification or status information." 8 U.S.C. § 1373(c).

Section 1373(c) thus unambiguously requires, and so authorizes, DHS to "verify or ascertain the citizenship or immigration status of any individual." *Id.* That provision is framed as

a command, and "[c]ommand includes permission." Antonin Scalia & Bryan A. Garner, *Reading Law* 193 (2012). "If you must do something, then you are necessarily allowed to do it." *Id.*

Sections 1373(a) and (b), too, authorize the alleged actions here. By prohibiting interference with DHS's sending and receiving of information regarding citizenship status, Section 1373(a) necessarily presupposes that DHS possesses the authority to send and receive that information. And Section 1373(b)'s caption, "Additional authority of government entities," shows that it grants governmental entities the authority to engage in the activities it lists—sending, requesting, exchanging, and maintaining information regarding immigration status.

Thus, existing authority permits DHS to provide an infrastructure that could provide States with citizenship list information. And DHS is constrained by the EO and June 8 memo to act consistent with statutory authority and all other applicable law.

**4. Plaintiff's Proposed Relief Goes Well Beyond Appropriate Limits**

The only proper relief, if any, is a remand to the Department of Homeland Security for further explanation or other action consistent with the correct legal standards. When reviewing agency action under § 706(2), the function of the reviewing court ends when "an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Thus, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the [agency action] must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus. Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *see also Norton*, 542 U.S. at 66-67 (explaining how the APA's limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

## CONCLUSION

For the reasons stated, the Court should deny summary judgment to Plaintiffs.

Dated: September 10, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Joshua N. Schopf*
JOSHUA N. SCHOPF
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.: (202) 514-6304
Email: joshua.n.schopf@usdoj.gov

*Counsel for Defendants*