**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, et al.;<br><br>Defendants. | Case No. 8:26-cv-03457-PX |

**NOTICE**

Plaintiff respectfully submits this notice of supplemental authority. Today, the Supreme Court issued its decision in *Department of Homeland Security v. League of Women Voters*, No. 26A308 (U.S. Sept. 25, 2026), staying the district court's summary judgment order pending appeal and disposition of a petition for writ of certiorari. That decision is attached. As noted in Plaintiff's briefing, the *League of Women Voters* case implicates certain issues relevant to the present litigation. *See* Pl.'s Memo. Of Law In Support of Its Mot. For Partial Summ. Judg., Dkt. 7-1 at 7, 10-11, 13, 15, 17-19, 25, 27; Pls.' Reply Memo. In Support of Its Mot. For Partial Summ. Judg., Dkt. 39 at 7-13. Plaintiff respectfully suggests that, if needed, the parties file submissions simultaneously by Monday, September 28 at 5 p.m. to address the implications of this decision.

Dated: September 25, 2026

Respectfully submitted

<u>/s/ Nikhel S. Sus</u>

Nikhel S. Sus (Bar No. 31090)
John B. Hill*
Reuven Dashevsky*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
rdashevsky@citizensforethics.org

John Davisson*
Mayu Tobin-Miyaji*
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, D.C. 20036
(202) 483-1140
davisson@epic.org
tobin-miyaji@epic.org

R. Orion Danjuma*
Julia L. Torti*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
orion.danjuma@protectdemocracy.org
jules.torti@protectdemocracy.org

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
(202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Jane Bentrott*
Shelby Teeter*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
jane.bentrott@protectdemocracy.org
shelby.teeter@protectdemocracy.org

*Counsel for Plaintiff*

* Admitted *pro hac vice*

# SUPREME COURT OF THE UNITED STATES

No. 26A308

DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* LEAGUE OF WOMEN VOTERS, ET AL.

ON APPLICATION FOR STAY

[September 25, 2026]

PER CURIAM.

Since 1986, the Systematic Alien Verification for Entitlements (SAVE) program has allowed federal, state, and local government agencies to verify the citizenship and immigration status of noncitizens applying for public benefits. For decades, it relied on records maintained by the Department of Homeland Security (DHS), the Department of Justice, and the Department of State.

Last year, the Federal Government expanded SAVE's scope. In March 2025, President Trump signed an Executive Order directing DHS to put new systems in place to allow state and local authorities to verify the citizenship status of registered voters and individuals registering to vote. Exec. Order No. 14248, 90 Fed. Reg. 14006 (2025). The Executive Order also directed the Social Security Administration (SSA) to make its records available to DHS for that purpose. *Id.*, at 14007.

Two months later, DHS launched a modified SAVE program. The modified program differed from the original in two key respects. First, it incorporated checks against additional records—including social security numbers (SSNs)—maintained by SSA. Second, it allowed state and local authorities to conduct bulk searches of multiple individuals at once.

Under the modified SAVE program, a state or local agency seeking to determine an individual's citizenship

status first uploads the individual's first name, last name, date of birth, or full or partial SSN to the SAVE portal. The SAVE program automatically discloses that information to SSA, which runs it through its databases to find a match. SSA then discloses its search results to DHS, including the individual's full name, date of birth, full SSN, and citizenship status. Finally, the SAVE portal returns a response to the agency, either confirming that the individual is a citizen or requesting that the agency resubmit its query with additional information. If the modified SAVE program is unable to confirm that an individual is a citizen, the agency is required to contact the individual and request that he provide proof of citizenship to register or remain registered to vote.

Various organizations—including the League of Women Voters, its local affiliates, and the Electronic Privacy Information Center—sued DHS, SSA, and other federal actors to challenge the modified SAVE program. As relevant here, they raised three claims. First, they alleged that the modifications violated a confidentiality provision in the Social Security Act that prohibits the disclosure of SSNs and other SSA records. Second, they alleged that the modifications violated substantive and procedural protections in the Privacy Act of 1974, which prohibits the nonconsensual disclosure of certain information and requires that agencies complete a notice-and-comment process for program modifications. Third, they alleged that the modifications were arbitrary and capricious under the Administrative Procedure Act (APA).

The plaintiff organizations moved for summary judgment on all three claims. The Government cross-moved to dismiss or, in the alternative, for summary judgment, arguing that plaintiffs lacked Article III standing; that the modified SAVE program did not violate the Social Security Act, Privacy Act, or APA; and that Congress had authorized DHS in 8 U. S. C. §1373 to use SSNs and related records notwithstanding any other provision of law.

The District Court agreed with the plaintiff organizations across the board, set aside and vacated the modified SAVE program and its related notices, and denied the Government's application for a stay pending appeal. A divided panel of the D. C. Circuit (Srinivasan, C. J., Wilkins, J., and Katsas, J.) also denied the Government's application for a stay, with Judge Katsas dissenting.

The Government now seeks a stay from this Court. To succeed, the Government must establish "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). In "close cases," we "balance the equities and weigh the relative harms to the applicant and to the respondent." *Ibid.* We grant the application.

To start, we consider the likelihood that this Court would reverse. At least one of plaintiffs' members (J. Doe 4) is registered to vote in a State (Louisiana) that used the modified SAVE program. She has demonstrated that SSA records do not accurately reflect that she is now a naturalized citizen. Supplemental Decl. of J. Doe in No. 25–cv–3501 (D DC), ECF Doc. 16–3, ¶¶2, 14. Had the modified SAVE program not been set aside, she likely would have been required to provide additional proof of citizenship. Such a "need to take . . . affirmative steps to avoid risk of harm . . . constitutes a cognizable injury" supporting standing. *Meese* v. *Keene*, 481 U. S. 465, 475 (1987).

Although the plaintiff organizations likely have standing, their claims likely lack merit. The plaintiff organizations claim that the federal defendants violated the Social Security Act, Privacy Act, and APA. In 1996, Congress, however, separately and expressly authorized DHS to request and receive information relating to citizenship and

immigration status from other agencies, including SSA, in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

The relevant IIRIRA provision, 8 U. S. C. §1373, contains two notwithstanding clauses. The first, section 1373(a), provides:

> "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

The second, section 1373(b), which is captioned "Additional authority of government entities," similarly provides:

> "Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual."

The "following" activities include "[s]ending such information to, or requesting or receiving such information from, the [DHS]." §1373(b)(1).

By prohibiting interference with the disclosure of information regarding citizenship status to DHS—"[n]otwithstanding any other provision of Federal, State, or local law"—Congress necessarily authorized DHS to request and receive that information. Otherwise, agencies, entities, and officials could find themselves in the impossible predicament of either disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and Privacy Act or withholding that information consistent with those Acts but in violation of section

1373. It is improbable that Congress intended to place officials in such a bind when it passed IIRIRA, so section 1373 likely supersedes restrictions on disclosure elsewhere in the Code.[1]

Lest there be any doubt, section 1373(c) requires DHS to respond to inquiries from state and local agencies "seeking to verify or ascertain the citizenship or immigration status of any individual." Considered alongside section 1373's "notwithstanding" clauses, section 1373(c) appears to contemplate an information-sharing regime like the modified SAVE program. In light of these provisions, this Court is likely to reverse the District Court's holding that the federal defendants violated the Social Security Act, the Privacy Act, and the APA.

The remaining factors also warrant a grant. We have often granted certiorari where a lower court has set aside an important federal program. See, *e.g.*, *Bondi* v. *VanDerStok*, 604 U. S. 458 (2025); *Department of Education* v. *Career Colleges and Schools of Texas*, 604 U. S. 1074 (2025). And, on the equities, the Federal Government is likely to suffer irreparable harm absent a stay. Under section 1373(c), the Federal Government has an obligation to respond to requests from state and local election officials seeking to verify the citizenship of voters. The order below prevents the Federal Government from using the program it believes is best suited to the task.

---

[1] The dissent argues that sections 1373(a) and (b) do not displace laws restricting information sharing with DHS because "[w]hen a law imposes an express restriction on disclosure, it is *that law*—not an 'entity,' 'official,' 'person,' or 'agency'—that is doing the 'prohibit[ing]' or 'restrict[ing].'" *Post*, at 7 (opinion of JACKSON, J.). But the distinction the dissent draws between laws and those tasked with enforcing them is illusory. Sections 1373(a) and (b) prohibit any "entity," "official," "person," or "agency" from "prohibit[ing]" or "*in any way* restrict[ing]" the request for or receipt of information regarding immigration status. (Emphasis added.) Those prohibitions necessarily include invoking a law to deny a request for or transfer of such information.

The plaintiff organizations argue that the Federal Government will not suffer irreparable harm because federal law currently prohibits state and local election authorities from clearing their voter rolls in the weeks leading up to federal elections. The organizations point to the National Voter Registration Act (NVRA), 52 U. S. C. §20507(c)(2)(A), which provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."[2] To be sure, that moratorium limits the potential impact of staying the District Court's order in this case. Still, all agree that the order prevents the Federal Government from using the modified SAVE program to conduct *individualized* inquiries, which are permitted under federal law during this period. The District Court's order thus inhibits the Federal Government's efforts to assist state and local agencies in the proper administration of the midterm elections. Under these circumstances, the equities weigh in favor of a stay.

* * *

For the foregoing reasons, the application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The June 22, 2026 order entered by the United States District Court for the District of Columbia in case No. 25–cv–3501 is stayed pending the disposition of appeal to the United States Court of Appeals for the District of Columbia and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be

[2] We will consider the scope of this provision in *Republican National Committee* v. *Mi Familia Vota, et al.*, No. 25–1017, which asks whether the NVRA prohibits States from implementing programs within 90 days of federal elections to cancel the registrations of voters who are not U. S. citizens. The parties in this case do not ask us to address that question and have not briefed it, and we do not need to decide it here.

denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 26A308

DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* LEAGUE OF WOMEN VOTERS, ET AL.

ON APPLICATION FOR STAY

[September 25, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Since 2005, States have used a Department of Homeland Security (DHS) database called Systematic Alien Verification for Entitlements (SAVE) to ensure that registered voters are American citizens. For most of its life, SAVE consisted almost entirely of immigration records from DHS. In 2025, however, DHS and the Social Security Administration (SSA) decided to connect SSA's database of master files, including all its sensitive information, to SAVE. A group of organizations sued, arguing that the modifications to SAVE violated various federal privacy laws, and that the staleness of SSA's citizenship records risked disenfranchising recently naturalized U. S. citizens. After months of litigation, the District Court agreed and vacated the modifications.

The D. C. Circuit denied a stay of the District Court's order while reviewing the pending appeal. But, without full briefing or oral argument, this Court now grants one—rendering questionable interim rulings about two statutory provisions it has never before interpreted. The Court also focuses only on the harms the Government will purportedly suffer absent a stay, disregarding the harms that the modified SAVE system has caused, and will likely continue to cause, to lawful voters. The Court thus misuses its equitable powers. Accordingly, I respectfully dissent.

I

A

SAVE is a database that "provides point in time immigration status and U. S. citizenship information to federal, state, local, territorial, and tribal agencies." Application for Stay 5 (internal quotation marks omitted). It was created in 1986 to help States verify eligibility for federally funded benefits like Medicaid and food stamps, which are typically limited to citizens and lawful immigrants. See Immigration Reform and Control Act of 1986, §121, 100 Stat. 3391, note following 42 U. S. C. §1320b–7; see also 42 U. S. C. §1320b–7. Since 2005, States have used SAVE for voter-verification purposes too. Application for Stay 6. Twenty-seven States currently use SAVE for that purpose. *Ibid.*

Until 2025, SAVE did not have access to natural-born citizens' records, and it only accessed immigration and naturalization records in DHS's systems (and occasionally, in systems at the State Department and the Department of Justice). Users could also only conduct individual searches, usually by way of a person's alien-identification number. 835 F. Supp. 3d 79, 102–103 (DC 2026). In 2025, however, President Trump signed an Executive Order purporting to target voting by noncitizens in federal elections that, among other things, directed SSA to share its databases with state and local election officials for the purposes of voter verification. The Order required this information-sharing even though the Social Security Act dictates that "[s]ocial security account numbers and related records . . . shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U. S. C. §405(c)(2)(C)(viii)(I); see Exec. Order No. 14248, 90 Fed. Reg. 14007 (2025).

To comply with the Executive Order, DHS and SSA agreed to overhaul SAVE and link SSA's master social security files, which are held in a database called NUMIDENT, to SAVE. NUMIDENT contains information

about natural-born U. S. citizens as well as naturalized citizens and noncitizens—not just social security numbers (SSNs) but also "names, dates and places of birth, citizenship indicators, death records, and information obtained while processing requests for SSNs." 835 F. Supp. 3d, at 101. With the modified SAVE system, a state user can submit bulk queries using full or partial SSNs as well as alien-identification numbers. *Id.*, at 102–103. If a query is inconclusive, a State might respond by asking the voter to provide proof of citizenship in order to remain registered, and it might strike the voter from the rolls if she fails to timely do so. *Id.*, at 108–109.

Before the overhaul, DHS had recognized SAVE as the sort of database that was covered by the federal Privacy Act. That Act requires agencies to publish a so-called system of records notice (SORN) anytime it "establish[es]" or "modifie[s]" any system of records containing personal identifying information. 5 U. S. C. §552a(e)(4). The agency is then prohibited from disclosing anyone's information in the system without consent, §552a(b), unless (among other things) the disclosure is for a "routine use," §552a(b)(3). "[A]t least 30 days prior" to adopting a new routine use, however, the Act requires that an agency publish a SORN and offer a 30-day comment period. §552a(e)(11).

When DHS had modified SAVE in the past, it had published a timely SORN and complied with the Act's comment requirements. See 835 F. Supp. 3d, at 100 & n. 1. But this time, neither DHS nor SSA published a SORN or invited comments. Instead, on May 22, 2025, they simply announced that the modified SAVE system was ready. See *id.*, at 101.

B

Several organizations (Respondents here) promptly sued DHS and SSA under the Administrative Procedure Act (APA), alleging that the SAVE modifications were arbitrary

and capricious and violated the Privacy Act's procedural and substantive requirements. Class Action Complaint in No. 1:25–cv–3501 (D DC), ECF Doc. 1, ¶¶204–218. In fall of 2025, DHS and SSA belatedly published SORNs that announced new "routine uses" covering the NUMIDENT information and offered a 30-day comment period. 835 F. Supp. 3d, at 102; see Notice of a Modified System of Records, 90 Fed. Reg. 48948 (2025); Notice of a Modified System of Records, 90 Fed. Reg. 50879. The SORNs claimed that the new routine uses would not go into effect for 30 days. *Id.*, at 40849, 50880. But the modified SAVE system (which involved disclosures that were covered by the newly announced routine uses) had already been in operation since May. See 835 F. Supp. 3d, at 100–101.

So, Respondents filed an amended complaint, further alleging that the modifications to SAVE violated the Social Security Act's confidentiality provision at 42 U. S. C. §405(c)(2)(C)(viii)(I). First Amended Complaint in No. 1:25–cv–3501, ECF Doc. 61, ¶204. And they bolstered their Privacy Act claims, arguing that SSA's disclosures of NUMIDENT information did not count as a "routine use" under the Act, and regardless, DHS and SSA had unlawfully failed to timely publish a SORN, or provide a public comment period, before sharing that information. *Id.*, at ¶¶218–235. Respondents also claimed that outdated SSA data put some of their recently naturalized members at risk of either being deregistered to vote or having to verify their citizenship before being allowed to cast ballots in the 2026 primary or general elections. *Id.*, at ¶¶168–170.

The parties then litigated the case to summary judgment, where the Government asserted that a provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 8 U. S. C. §1373, gave DHS and SSA the authority to implement their modifications to SAVE regardless of the requirements of the Social Security Act and the Privacy Act. That statutory section provides that

"[n]otwithstanding any other provision of Federal, State, or local law," no "government entity" or "official," "person[,] or agency," may "prohibit, or in any way restrict," the exchange of citizenship information with DHS. §§1373(a)–(b). It also obligates DHS to respond to state and local officials' inquiries regarding a person's citizenship status. §1373(c).

The District Court rejected the Government's argument that §1373 overrode the Social Security Act and the Privacy Act and granted summary judgment to Respondents, concluding that the modified SAVE system violated both laws, as well as the APA. 835 F. Supp. 3d, at 119–120, 130, 134–136. The District Court then vacated the modifications to SAVE. *Id.*, at 138. At that point, the Government sought a stay in the District Court, where it raised several new arguments about why the Social Security Act's confidentiality provision did not apply to the modified SAVE system. See No. 1:25–cv–3501 (D DC, July 8, 2026), App. to Application for Stay 81a–84a (App.) (describing the Government's arguments).[1] The District Court denied the stay and refused to consider the forfeited arguments in that posture, but invited the Government to raise them via a Rule 52(b) motion to reopen the judgment. See *id.*, at 85a, n. 3.

The Government did not take the District Court up on that invitation. Instead, it requested an emergency stay from the D. C. Circuit, even though it was too late for States to use SAVE for systematic voter-list maintenance in advance of the 2026 elections. See 52 U. S. C. §20507(c)(2)(A)

[1] Specifically, the Government claimed that the confidentiality provision did not apply because the information disclosed through the modified SAVE system was collected pursuant to the original Social Security Act of 1935, and the confidentiality provision only restricted disclosures of information "obtained or maintained" pursuant to laws enacted "on or after October 1, 1990." App. 81a–82a; see 42 U. S. C. §405(c)(2)(C)(viii)(I). The Government also claimed that NUMIDENT records disclosed through the modified SAVE system did not count as "social security numbers [or] related records" under the provision. App. 81a–82a.

(prohibiting States from "systematically remov[ing] the names of ineligible voters" from their rolls during the 90 days prior to any primary or general election).[2] A divided panel of the D. C. Circuit denied the requested stay. No. 26–5243 (Sept. 4, 2026), App. 102a; see also *id*., at 133a (Katsas, J., dissenting).

The Government now asks this Court to stay the District Court's ruling. Per the oft-repeated stay factors, a stay applicant must demonstrate that it is "likely to succeed on the merits" of its appeal, that it will be "irreparably injured" absent a stay, and that the equities weigh in its favor. *Nken* v. *Holder*, 556 U. S. 418, 426 (2009) (internal quotation marks omitted); see also *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).

II

The majority concludes that the Government has made the necessary "strong showing" of likely success on the merits, *Nken*, 556 U. S., at 426 (internal quotation marks omitted), because two IIRIRA provisions that we have never before interpreted likely authorize the modifications to SAVE and displace any other statutory restrictions on the disclosure of citizenship information. See *ante,* at 4–5; 8 U. S. C. §§1373(a)–(b).[3] As the majority sees things, Congress's "prohibiting interference with the disclosure of information regarding citizenship status to DHS" in §§1373(a) and (b) "necessarily authorize[s] DHS to request and receive that information" from SSA, regardless of whether some other law prohibits disclosure. *Ante,* at 4. The majority thus treats §1373 as essentially overriding the limits that

---

[2] In fact, as the D. C. Circuit recognized, the Government had conceded that the "90-day limitation was 'fatal' to a claim of imminent harm premised on systematic voter-roll maintenance." No. 26–5243 (CADC, Sept. 4, 2026), App. 131a.

[3] The *per curiam* properly rejects the Government's threshold argument that Respondents lack standing to sue. See *ante,* at 3; see also Application for Stay 11–18.

privacy laws impose on the sharing of citizenship information with DHS. But that "back-of-the-napkin assessment," *Noem* v. *Doe*, 605 U. S. 961, 962 (2025) (JACKSON, J., dissenting from grant of stay), is implausible.

For starters, the majority misreads the statutory text. Subsections 1373(a) and (b) bar "government entit[ies] or official[s]" (in §1373(a)) and "person[s] or agenc[ies]" (in §1373(b)) from "prohibit[ing], or in any way restrict[ing]," the exchange of citizenship information with DHS, "notwithstanding any other provision" of law. These provisions do not affirmatively grant any power. Nor do they override any explicit statutory limits on information-sharing. Rather, both provisions bar government entities or employees from interfering with otherwise lawful exchanges of citizenship information, notwithstanding that such interference may be permitted under some other law. When a law imposes an express restriction on disclosure, it is *that law*—not an "entity," "official," "person," or "agency"—that is doing the "prohibit[ing]" or "restrict[ing]." Neither §1373(a) nor (b) has anything to say in that circumstance.[4]

Statutory context confirms that this reading is the better one. Another part of IIRIRA lets SSA respond to citizenship-status inquiries to verify an individual's employment eligibility. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, §§404(e), (h), 110 Stat. 3009–546, 3009–665, note following 8 U. S. C. §1324a. But those provisions put strict limits on what information SSA can disclose—limits that would be meaningless if §1373 means

---

[4] This means the "impossible predicament" that causes the majority angst—*i.e.*, the problem of agencies being forced to choose between, on the one hand, "disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and Privacy Act" and, on the other, "withholding that information consistent with those Acts but in violation of section 1373," *ante,* at 4–5—is no predicament at all. DHS and SSA may exchange information consistent with the Social Security and Privacy Acts, but may not exchange information in violation of those laws.

what the majority says it means. See *ibid.*; see also 835 F. Supp. 3d, at 136; No. 26–5243 (CADC, Sept. 4, 2026), App. 121a.

IIRIRA's enactment history also supports this view. Section 1373 was passed to respond to a particular problem: state and local agencies refusing to cooperate with federal officials in enforcing immigration laws. See H. R. Rep. No. 104–725, p. 383 (1996); S. Rep. No. 104–249, pp. 19–20 (1996). The language Congress ultimately chose sweeps more broadly, insofar as it covers federal, state, and local officials alike. But there is no reason to believe that Congress meant to repeal laws that would otherwise prohibit federal agencies from disclosing citizenship information.

Contemporaneous Executive Branch practice reflects this same understanding. Addressing the provision at issue here, the Office of Legal Counsel once maintained that §1373(a) does "not clearly invest governmental officials or entities with the affirmative authority to disclose information in circumstances where they otherwise would be prohibited from doing so by a federal statute." Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information, 23 Op. OLC 5 (Supp. 1999).

Finally, "common sense" weighs in favor of this interpretation, *Biden* v. *Nebraska*, 600 U. S. 477, 512 (2023) (BARRETT, J., concurring), because it harmonizes §§1373(a) and (b) with existing restrictions on disclosures of citizenship information. Under the *per curiam*'s reading, by contrast, those provisions trump any such restrictions and give SSA the authority to share whatever citizenship information it wants. In the three decades since Congress enacted IIRIRA, the Government has never invoked §1373 in that way—even as it has repeatedly refined the SAVE program. And when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a

'transformative expansion in its regulatory authority,'" this Court's recent practice has been to ask for a clear statement, absent from §1373, conferring such a power. See, *e.g.*, *West Virginia* v. *EPA*, 597 U. S. 697, 724 (2022) (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014); alteration omitted); see also *Learning Resources, Inc*. v. *Trump*, 607 U. S 229, 245–246 (2026) (opinion of ROBERTS, C. J.).

In response to all this, the *per curiam* just insists that its interpretation is required by another provision of IIRIRA: §1373(c). *Ante,* at 5. That provision plainly vests DHS with authority to respond to citizenship-status queries submitted by state and local agencies. 8 U. S. C. §1373(c). But it does not empower SSA (or any other non-DHS agency) to do anything, let alone share information that other laws make confidential. And even as to DHS, §1373(c) does not contain the "clearly expressed congressional intention" necessary to displace other laws restricting disclosures. *Epic Systems Corp*. v. *Lewis*, 584 U. S. 497, 510 (2018) (internal quotation marks omitted). In fact, just the opposite, insofar as that provision only authorizes disclosures "for . . . purpose[s] authorized by law." §1373(c).

As a result, nothing in §1373 authorizes the modified SAVE system or overrides the provisions of the Social Security Act and the Privacy Act that Respondents say the Government has violated. And the Government puts forward no nonforfeited arguments that the modifications to SAVE in fact complied with the Social Security Act's confidentiality provision. See Application for Stay 30–33; No. 26–5243 (CADC, Sept. 4, 2026), App. 113a–120a.[5] These

---

[5] Recall that the Government failed to argue, at the summary judgment stage, that the Social Security Act's confidentiality provision did not apply to the modified SAVE system on its own terms. Instead, the Government raised those arguments for the first time in its stay motion before the District Court. See n. 1, *supra*. There is little reason to forgive such a forfeiture in the stay context, where the party asking this Court

are reasons enough to find that the Government is unlikely to succeed on the merits of its appeal, so I would not reach the Government's arguments regarding the Privacy Act and the APA.[6]

III

As I noted previously, a stay applicant must also show "that it will suffer irreparable harm while the case proceeds, and that, on balance, the equities . . . favor a stay." *Trump* v. *California*, 609 U. S. ___, ___ (2026) (dissenting opinion) (slip op., at 6). The majority's analysis of those factors is faulty.

First, the *per curiam* finds that the Government is irreparably harmed absent a stay because the District Court "set aside an important federal program." *Ante,* at 5. But if the Government has failed to show that modified SAVE comports with the Social Security Act, then disabling the Government from using that program is not a cognizable harm. It cannot be that the Government is "injured whenever [it] is prevented from" violating the law. *Trump* v. *Orr*, 607 U. S. ___, ___ (2025) (JACKSON, J., dissenting from grant of stay) (slip op., at 10); see also *California*, 609 U. S., at ___,

---

to exercise its equitable discretion is the party who failed to properly raise its arguments below. See *State Railroad Tax Cases*, 92 U. S. 575, 616 (1876) ("[H]e who seeks equity at the hands of the court must first do equity"); see also *Ohio* v. *EPA*, 603 U. S. 279, 298–299 (2024).

[6] Notably, however, Respondents' claim that the Government ignored the procedural requirements of the Privacy Act (which it obviously did) should not be affected even under the *per curiam*'s reading of §1373. Subsections 1373(a) and (b) apply only to "prohibit[ions]" or "restrict[ions]" on the exchange of citizenship information with DHS. The portions of the Privacy Act requiring agencies to publish SORNs and to provide 30-day comment periods before implementing new routine uses do not "prohibit" or "restrict" anything. See 5 U. S. C. §552a(e)(4), (11). Nor do they affect DHS's ability to respond to citizenship-status inquiries as required under §1373(c). The *per curiam*'s failure to grapple with this point is yet another indication that its interpretation of §1373 is mistaken.

___–___ (JACKSON, J., dissenting) (slip op., at 8–9). And anyway, the Government's purported harm is substantially mitigated by its ability to use the pre-2025 version of SAVE.

Next, in balancing the equities, the majority only looks at one side of the scale—the judicial equivalent of expecting a seesaw with weight applied on only one side to work properly. In the *per curiam*'s view, the sole harm here is that the District Court's order "inhibits the Federal Government's efforts to assist state and local agencies in the proper administration of the midterm elections." *Ante,* at 6. As a threshold matter, this overvalues the harm to the Government, since States cannot use SAVE to systematically strike people from the voter rolls within 90 days of an election in any event. See 52 U. S. C. §20507(c)(2)(A); see also No. 26–5243 (CADC, Sept. 4, 2026), App. 131a. It is hard to see how the Government is harmed pending the completion of the court proceedings below when SAVE's application to the upcoming elections will already be limited.

Even more concerning is the majority's omission of any consideration of the harms that might occur if the modified SAVE system is allowed to continue operating. See *California*, 609 U. S., at ___ (JACKSON, J., dissenting) (slip op., at 10). The District Court highlighted such harms, noting the risk that States might cancel the voter registrations of at least some recently naturalized citizens or force such persons to provide proof of citizenship before voting. 835 F. Supp. 3d, at 108–109. That court also found that those harms have already materialized in Texas, where one of Respondents' members "had her voter registration revoked without her knowledge," and two more "had to provide proof of citizenship to maintain registered voter status." *Id.*, at 113. But the *per curiam*'s purported balancing fails to address, much less account for, the demonstrated harms of issuing a stay. See *Orr*, 607 U. S., at ___ (JACKSON, J., dissenting) (slip op., at 3).

* * *

The Government has not shown that it is entitled to the "'extraordinary'" remedy of a stay pending appeal. *Doe*, 605 U. S., at 963 (JACKSON, J., dissenting) (quoting *Graves* v. *Barnes*, 405 U. S. 1201, 1203 (1972) (Powell, J., in chambers)). But if there is a bright side to today's opinion deciding otherwise, it is that the *per curiam* will likely have minimal short-term impact, as States will at most conduct individualized voter-roll maintenance using the modified SAVE system ahead of the November elections. See *ante,* at 6. In my view, however, the harm caused by burdening or disenfranchising even a few lawful voters outweighs the nonexistent harm that the Government experiences when it is prevented from taking an action that it likely lacks the authority to take. This imbalance, along with the Government's improbable merits arguments, should have compelled the Court to deny the stay.