**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ELECTRONIC PRIVACY INFORMATION CENTER.,

Plaintiff,

v.

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,

Defendants.

No. 8:26-cv-03457-PX

**DEFENDANTS' SUPPLEMENTAL BRIEF IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................1

Verification of Immigration Status Under Federal Law..........................................1

Executive Order 14,399.........................................................................................3

The June 8 Memo...................................................................................................3

Plaintiffs' Complaint...............................................................................................4

The Supreme Court's Decision in *League of Women Voters*. ................................5

ARGUMENT..........................................................................................................7

I. Section 1373 Supplies Statutory Authority for the Memorandum and Portal/List Contemplated Therein; Therefore, Count One Fails. ..........................................7

II. Section 1373 Governs Notwithstanding "Any Other Provision" of Federal Law; Therefore, Counts Two Through Four Also Fail. ............................................10

CONCLUSION......................................................................................................11

## INTRODUCTION

On September 3, 2026, Plaintiff sought partial summary judgment on claims that an internal memorandum issued by the Department of Homeland Security ("DHS") to implement Executive Order 14,399 exceeded statutory authority and violated the Social Security and Privacy Acts. ECF 7.[1] Defendants opposed one week later, demonstrating—*inter alia*—that Plaintiff has neither established reviewable final agency action nor Article III standing. *See generally* ECF 36. These defects (among others) were, and remain, fatal to Plaintiff's motion. *Id.* But Plaintiff's motion now fails for yet another reason: the Supreme Court's September 25, 2026, decision in *DHS v. League of Women Voters*, No. 26A308, 609 U.S. ----, 2026 WL 2879700 (Sep. 25, 2026) (per curiam) (hereafter, "*LWV*") demonstrates unequivocally that the four claims at issue all fail on the merits. For the reasons discussed in Defendants' opposition, and herein, Plaintiff's motion should be denied.[2]

## BACKGROUND

**Verification of Immigration Status Under Federal Law.** In the Immigration Reform and Control Act of 1986, Congress required DHS's predecessor agency to "implement a system for [] the verification of immigration status." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391 (2021); 42 U.S.C. § 1320b-7 (note). Then, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress placed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any

---

[1] *See* ECF 7-3, Subject: "Executive Order 14399 Implementation" ("June 8 Memo." or "the Memorandum").

[2] Defendants reserve the right to file a cross-motion for summary judgment in light of the Supreme Court's decision.

purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To fulfill these obligations, DHS has long used the Systematic Alien Verification for Entitlements ("SAVE") system, which is "an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE* (Oct. 7, 2025), https://perma.cc/5888-TH46. "In fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.* In doing so, SAVE "[i]ncorporates privacy principles and security measures into user agencies' processes and procedures." *Id.*[3]

Congress also spoke directly to the issue of "[c]ommunication between" other "government agencies and" DHS. 8 U.S.C. § 1373. Congress provided expressly that, "[n]otwithstanding *any other provision* of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or *in any way restrict*, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a) (emphases added). Congress also emphasized—again "[n]otwithstanding *any other provision* of Federal, State, or local law"—that "*no person* or agency may prohibit, or *in any way restrict*, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual[.]" *Id.*

[3] Separately, under the Help America Vote Act of 2002, the Social Security Administration ("SSA") has long been required to provide Social Security Number verification responses directly to States for voter-verification purposes, including verifications on last-four-digit SSNs. *See* 42 U.S.C. § 405(r)(9).

§ 1373(b) (emphases added). Congress provided similar clarity about sharing information with States for this purpose: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

**Executive Order 14,399.** On March 31, 2026, the President signed Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("Executive Order," "Order," or "E.O."). Among other things, the Order directs the Secretary of Homeland Security, to "the extent feasible and consistent with applicable law," to "compile and transmit" a State Citizenship List, consisting of "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." *Id.* § 2(a). "The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* The Order also directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" "within 90 days of the date" of the Order, which was by June 29, 2026. *Id.* § 4(c). The State Citizenship List "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election." *Id.* § 2(a). As of September 10, 2026, however, none of the "infrastructure" contemplated by E.O. § 4(c) had been established. *See* ECF 36-1 (Mayhew Decl.); ECF 36-2 (MacBride Decl.).

**The June 8 Memo.** On June 8, 2026, the Secretary of Homeland Security approved an internal memorandum adopting USCIS's then-current plan for carrying out Section 2(a) of the E.O. ECF 7-3 (June 8 Memo.). "Utilizing existing [DHS] statutory authority"—specifically, 8

U.S.C. § 1373—the "core" of the approach proposed in the Memorandum was a "technological mechanism" to "provide States with citizenship list information from USCIS, SSA, and [the Department of State, "DOS"], including a digital portal mechanism for States to access and download such information." *Id.* at 1, 2 (noting that DHS "possesses statutory authority under 8 U.S.C. § 1373 to send and receive immigration status information to and from federal, state, and local government entities, to maintain such information, and to exchange such information with federal, state, and local government entities"). "In practice," state election officials would be given access to a "portal" via Login.gov, via which States would be able to download "separate outputs" from USCIS, SSA, and State; the downloaded files would provide "citizenship related data elements," such as name and date of birth. *Id.* at 2. The Memorandum was predicated on it being implemented in accordance with law, *id.*, and to date, implementation has not occurred. *See* Mayhew Decl.; MacBride Decl.

**Plaintiffs' Complaint.** On August 31, 2026, Plaintiff filed suit alleging, *inter alia*, that the June 8 Memorandum violates the APA, Social Security Act, and Privacy Act. ECF 1 (Compl.). Specifically, in Count I, Plaintiff brings an APA claim for agency action "in excess of statutory authority." *Id.* ¶¶ 130–37. Counts II, III, and IV, also APA claims, charge that the Memorandum is contrary to the Social Security Act (Count II) and Privacy Act (Counts III and IV). *Id.* ¶¶ 138–65. Plaintiff's remaining claims are that the Memorandum was arbitrary and capricious under the APA (Count V), and contrary to various constitutional principles and provisions (Counts VI and VII). *Id.* ¶¶ 166–80. Three days after filing suit, Plaintiff sought judgment as a matter of law on Counts I–IV. ECF 7. Defendants opposed one week later, arguing that Plaintiff's claims failed on threshold grounds and that 8 U.S.C. § 1373 authorized the challenged agency actions. ECF 36.

**The Supreme Court's Decision in *League of Women Voters*.** Months before filing the instant case, Plaintiff (and the League of Women Voters and affiliate organizations) had separately filed suit against DHS and SSA in the U.S. District Court for the District of Columbia, challenging those Agencies' recent expansion of SAVE for purposes of voter-verification under the APA, Privacy Act, and separation-of-powers principles. *See* Am. Compl. ¶¶ 197–251, *League of Women Voters v. DHS*, No. 1:25-cv-03501-SLS, ECF 61 (D.D.C. Jan. 21, 2026).[4] EPIC and its co-plaintiffs sought summary judgment. *Id.*, ECF 66 (filed Mar. 12, 2026). The government opposed and cross-moved, explaining (among other things) that plaintiffs' claims failed on the merits because the challenged conduct was statutorily authorized by 8 U.S.C. § 1373. *Id.*, ECF 77 (filed Apr. 2, 2026). The district court nonetheless granted the plaintiffs' motion and denied the government's motion. *Id.*, ECF 111, 112 (filed June 22, 2026).

On September 25, 2026, the Supreme Court of the United States granted the government's motion for a stay of the district court's order pending appeal, concluding that the plaintiffs' claims "likely lack merit." *LWV*, 2026 WL 2879700, at *2, *3. Namely:

> The plaintiff organizations claim that the federal defendants violated the Social Security Act, Privacy Act, and APA. In 1996, Congress, however, separately and expressly authorized DHS to request and receive information relating to citizenship and immigration status from other agencies, including SSA, in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

[4] "The modified program differed from the original in two key respects. First, it incorporated checks against additional records—including social security numbers (SSNs)—maintained by SSA. Second, it allowed state and local authorities to conduct bulk searches of multiple individuals at once." *LWV*, 2026 WL 2879700, at *1; *see also, e.g.*, USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

*Id.* at *2. In so holding, the Supreme Court emphasized the two provisions of Section 1373 that contain "notwithstanding other provisions" of law clauses. *Id.* (quoting Section 1373(a) and (b)). These provisions were dispositive, the Supreme Court explained:

> By prohibiting interference with the disclosure of information regarding citizenship status to DHS—"[n]otwithstanding any other provision of Federal, State, or local law"—Congress necessarily authorized DHS to request and receive that information. Otherwise, agencies, entities, and officials could find themselves in the impossible predicament of either disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and Privacy Act or withholding that information consistent with those Acts but in violation of section 1373. It is improbable that Congress intended to place officials in such a bind when it passed IIRIRA, so *section 1373 likely supersedes restrictions on disclosure elsewhere in the Code*.

*Id.* (footnote omitted) (emphasis added). In a footnote, the Court rejected the dissent's argument that Sections 1373(a) and (b) do not displace laws restricting information-sharing with DHS because "[w]hen a law imposes an express restriction on disclosure, it is *that law*—not an 'entity,' 'official,' 'person,' or 'agency'—that is doing the 'prohibit[ing]' or 'restrict[ing].'" *Id.* at *2 n.1 (quoting Jackson, J., dissenting). The majority called this distinction "illusory," and reiterated that the prohibitions in Section 1373(a) and (b) "necessarily include invoking a law to deny a request for or transfer of such information." *Id.*[5]

Finally, concerning the other stay factors, the Supreme Court determined that a stay was warranted because the lower court had set aside an "important federal program," causing the government "irreparable harm" by "inhibit[ing] the Federal Government's efforts to assist state and local agencies in the proper administration of the midterm elections." *Id.* at *3.

[5] Although not a focus of the opinion, "[l]est there be any doubt," the Court further noted that Section 1373(c) "appears to contemplate an information-sharing regime like the modified SAVE program." *LWV*, 2026 WL 2879700, at *3.

**ARGUMENT**

Defendants' opposition to Plaintiff's motion for summary judgment explained the myriad reasons why the motion should be denied, including threshold defects of jurisdiction (e.g., lack of standing/ripeness) and of the merits (e.g., no final agency action under *Bennett v. Spear*). This is all still true and supplies sufficient basis to deny the motion. But the Supreme Court's decision in *League of Women Voters* is dispositive. Even if Plaintiff had established subject-matter jurisdiction (it did not), and even if the Memorandum were reviewable agency action (it is not), and even if Defendants' additional arguments failed (such as Plaintiff's inability to evade the Privacy Act's limitations by bringing a Privacy Act claim couched in an APA claim), Plaintiff fails on the substantive merits in light of *League of Women Voters*. The eventual success of Counts I–IV on the merits depend upon a determination that DHS lacked statutory authority to promulgate the Memorandum. The Supreme Court has now made it abundantly clear that Section 1373—on which Defendants relied in opposition to summary judgment—provides that authority (defeating Count I), "notwithstanding" the Social Security and Privacy Acts (defeating Counts II–IV). Plaintiff's motion for summary judgment should be denied.

## I. Section 1373 Supplies Statutory Authority for the Memorandum and Portal/List Contemplated Therein; Therefore, Count One Fails.

Count I alleges that DHS has acted in excess of statutory authority by promulgating the Memorandum. During the hearing on September 25, 2026, this Court noted its "tentative[]" conclusion that *LWV* "tanks" this claim. Sep. 25, 2026, Hr'g Tr. at 6:2–9. The Court's tentative view was correct. On its face, the Memorandum contemplates the future creation of an infrastructure to share immigration status information with States. ECF 7-3. Under Section 1373(b), "*no person* or agency may prohibit, or *in any way restrict*, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, *State*, or

local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(b) (emphases added). This provision applies to Plaintiff and to other federal agencies, who may not "in any way restrict" DHS from exchanging information regarding immigration status with "any other" government entity. *Id.* If there were any doubt about the import of Section 1373(b), the Supreme Court has now erased it. 2026 WL 2879700, at *2–3.

At the hearing, Plaintiff made two arguments for why Count I survives *LWV*. Both fail.

*First*, Plaintiff attempted to distinguish *LWV* on the basis that, unlike the SAVE system, the portal contemplated by the Memorandum does not require an initiating State "inquiry" for the data, and "it is clear that . . . Section 1373 requires DHS to respond to inquiries from states and local agencies." Sep. 25, 2026, Hr'g Tr. at 6:17–7:23; *see also, e.g.*, *id.* at 12:7–16. This is a red herring. Only one of Section 1373's provisions alludes to such "inquiries": Section 1373(c), which obligates DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." But there are two more provisions in Section 1373, and *LWV* independently relied on the two provisions Plaintiff ignores: Section 1373(a) and (b). Both (a) and (b) contain language that the Supreme Court found key to its decision that the plaintiffs' claims regarding SAVE likely lacked merit: "[n]otwithstanding any other provision of Federal, State, or local law." *See LWV*, 2026 WL 2879700, at *2 (discussing these sections).

Of particular relevance here, Section 1373(b) ("Additional authority of government entities") provides that "*no person*" may "*in way restrict*" a federal, State, or local government entity (i.e., an executive agency) from: (i) "[m]aintaining" information regarding the "immigration status" of "any individual" (ii) "[s]ending such information to, or requesting or receiving such

information from," DHS; or (iii) "[e]xchanging such information with any other Federal, State, or local government entity" (emphasis added). Irrespective of Section 1373(c), then, Defendants' conduct here was expressly authorized and therefore manifestly lawful.

In any case, Plaintiff's cramped interpretation of Section 1373(c) does not hold water. By Plaintiff's telling, the Memorandum does not contemplate an "inquiry" akin to those contemplated by the SAVE system. But there is nothing in the Memorandum to support that interpretation. To the contrary, according to the Memorandum, to access the information available in the portal, state election officials would have to affirmatively log in and download it. June 8 Memo. at 2. That affirmative conduct would be materially similar to sending a request to DHS: either way, the State would itself initiate the transfer of data. This dispute, such as it is, underscores—for reasons already discussed in Defendants' opposition to the motion for summary judgment—the prematurity of Plaintiff's complaints regarding the Memorandum. The portal the Memorandum contemplates does not yet exist, and Plaintiff can only speculate what it will require if it ever materializes. But to the extent Plaintiff raises a facial challenge, there is no question on the text of the Memorandum that it reasonably contemplates a threshold "inquiry" from the State—in the form of log-in and download—akin to SAVE.

*Second*, Plaintiff argued that the statutory language "of any individual" constrains the agencies to maintaining and exchanging information about a single person or discrete group of persons. Sep. 25, 2026, Hr'g Tr. at 7:25–8:18. Plaintiff finds no support for this interpretation in the statutory text. *LWV* refutes it: The recent modifications to the SAVE system—which the Supreme Court's decision upholds as likely lawful under the authority of Section 1373—permit users to "create cases in bulk." *Supra* n.4. Nearly 50 million voter verification inquiries have been completed. USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025),

https://perma.cc/7HTF-BKRL ("SAVE Optimization has enabled state voting agencies to submit over 46 million voter verification queries[.]"). SAVE is already responding to State inquiries regarding millions of individual voters by providing citizenship and immigration status for each potential voter on an individualized basis, and the Supreme Court has endorsed its legality. The future portal would likewise respond to a request from a State and provide information about voters on an individual basis. Finally, Plaintiff's interpretation has no common-sense justification: why would it matter, for purposes of authority under Section 1373, whether citizenship information is transmitted for 100 particular individuals versus 1,000 versus 10,000?

In light of *LWV*, Section 1373(b) unambiguously supplies the authority that Plaintiff in Count I contends does not exist. The motion for summary judgment on Count I should be denied.

## II. Section 1373 Governs Notwithstanding "Any Other Provision" of Federal Law; Therefore, Counts Two Through Four Also Fail.

Counts II–IV challenge the Memorandum under the Privacy and Social Security Acts. At the September 25 hearing, Plaintiff acknowledged the "possibility" that "what the Supreme Court has said about the notwithstanding clauses in 1373(a) and (b) may change whether—or the way in which a Privacy Act claim and the Social Security Act claims operate here." Sep. 25, 2026, Hr'g Tr. at 16:8–12. Plaintiff has acknowledged the obvious: If Section 1373 grants the government the authority to maintain and exchange immigration information—as already accomplished by SAVE and now proposed in the June 8 Memorandum—then the challenged conduct is lawful, "notwithstanding" what the Privacy and Social Security Acts would otherwise require in procedure or substance. *See LWV*, 2026 WL 2879700, at *2 (noting that otherwise, "agencies, entities, and officials could find themselves in the impossible predicament of either disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and Privacy Act or withholding that information consistent with those Acts but in violation of section 1373. It

is improbable that Congress intended to place officials in such a bind when it passed IIRIRA, so *section 1373 likely supersedes restrictions on disclosure elsewhere in the Code*." (emphasis added)).[6] If Plaintiff still presses these claims after *LWV*, summary judgment should be denied.[7]

## CONCLUSION

For all the reasons stated above, and in Defendants' Opposition, Plaintiff's Motion for Partial Summary Judgment should be denied.

[6] Because information-sharing can occur "notwithstanding" the Privacy Act (and other laws), the issue of SORNS is irrelevant: SORNS are a creature of the Privacy Act, which is "supersede[d]" by Section 1373. *LWV*, 2026 WL 2879700, at *2.

[7] Plaintiff's conduct in this case is reflective of a growing (and disturbing) trend whereby litigants obtain emergency relief through premature motions for summary judgment without even attempting to satisfy the requirements of Rule 65. Rule 65 exists for a reason, and Plaintiff should not have been permitted to circumvent it. *See, e.g.*, Minute Order, *Oyer v. Blanche*, No. 26-cv-3092 (D.D.C. Oct. 1, 2026) (denying plaintiff's motion for summary judgment as premature, emphasizing that "Defendants have until November 3, 2026 to respond to the Complaint" and "[t]o efficiently resolve threshold matters, it is best to adhere to the traditional litigation sequence of complaint; answer or motion to dismiss; discovery, if appropriate; and only then, summary judgment"); *see also* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (observing that "in many cases" a motion for summary judgment is premature "until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had").

Dated: October 2, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

MARIANNE F. KIES
Assistant Branch Director

*/s/ Joshua N. Schopf*
JOSHUA N. SCHOPF
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.: (202) 514-6304
Email: joshua.n.schopf@usdoj.gov

*Counsel for Defendants*