**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,<br><br>Defendants. | Case No. 8:26-cv-03457-PX |

# PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 4

I. Section 1373 does not authorize DHS to preemptively distribute citizenship information unprompted by a qualifying request for that information under Section 1373(c). ........ 4

II. Section 1373 does not authorize the creation and dissemination of State Citizenship Lists because they are not about specified "individual[s]" for whom verification is sought. ........ 9

III. Section 1373 does not authorize the creation and dissemination of State Citizenship Lists because they exceed the statute's limitation to information regarding "citizenship or immigration status." ........ 12

A. Section 1373's plain text confirms the State Citizenship Lists are outside its scope. ........ 12

B. Agency practice and practical considerations confirm that Congress did not intend for DHS to collect, maintain, or disseminate state residency data, particularly in service of a voting integrity effort. ........ 15

IV. The major questions doctrine confirms DHS's lack of statutory authority. ........ 18

CONCLUSION ........ 18

Per the Court's instructions at the September 25 motion hearing, Plaintiff Electronic Privacy Information Center ("EPIC") submits this supplemental memorandum in support of its motion for partial summary judgment, to address the impact of the stay order in *DHS v. League of Women Voters ("LWV")*, 609 U.S. ----, 2026 WL 2879700 (Sep. 25, 2026) (per curiam).

## INTRODUCTION

No statute, including 8 U.S.C. § 1373, authorizes DHS's Implementation Memo and corresponding scheme to create and disseminate lists purporting to identify all adult U.S. citizens and their states of residence, while bulldozing through bedrock statutory privacy protections. The Supreme Court's stay-posture finding that 8 U.S.C. § 1373 likely authorizes the Modified SAVE system in *LWV* does not disturb this conclusion. Plaintiff therefore remains entitled to summary judgment on Counts I, II, III, and IV of its Complaint.

Though the Modified SAVE system at issue in *LWV* and the State Citizenship List efforts have some similarities, material differences between them make clear that neither Section 1373 nor the Supreme Court's preliminary interpretation of it authorizes the government's scheme here. First, unlike SAVE's reliance on users' queries to DHS seeking to verify the citizenship status of specified individuals, the Implementation Memo directs DHS to *preemptively* compile and disclose State Citizenship List data *unprompted* by any citizenship "verification" request. Second, the State Citizenship Lists contemplate the government disclosing data related to *all* purported U.S. citizens by state, in contrast to SAVE's verifications about specific "individual[s]" pursuant to DHS's duty to "respond" under Section 1373(c). Finally, the State Citizenship List data is not merely "citizenship status" information as contemplated by Section 1373; it entails information about hundreds of millions of Americans wholly *unrelated* to citizenship status, including their states of residence and other personally identifiable information. Nothing in Section 1373 or the *LWV* Court's preliminary reading of it authorizes this. This Court should decline to extend the

Supreme Court's preliminary ruling beyond the scope of what it articulated.[1]

## BACKGROUND

In *LWV*, the Supreme Court granted a stay pending appeal of a district court order vacating and setting aside DHS's modified Systematic Alien Verification for Entitlements system ("Modified SAVE"). In a short per curiam opinion, the Court stated that 8 U.S.C. § 1373 ("Section 1373"), a section of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, "appears to contemplate an information-sharing regime like the modified SAVE program," likely authorizes DHS to request and receive citizenship information "notwithstanding" other provisions of law, and "likely supersedes restrictions on disclosure elsewhere in the [U.S.] Code" that would otherwise prohibit Modified SAVE. *LWV*, 2026 WL 2879700, at *2–3.

That preliminary holding, by its terms, construed Section 1373 *as applied to the Modified SAVE system*; it did not—and could not—hold that Section 1373 authorizes any and all forms of information sharing by DHS. As the Court explained, it read Section 1373 as authorizing Modified SAVE itself, describing it as "the program [the federal government] believes is best suited to the task" of fulfilling its "obligation," imposed by Section 1373(c), "to respond to requests from state and local election officials seeking to verify the citizenship of voters." *LWV*, 2026 WL 2879700, at *3. Stated differently, SAVE is *the* mechanism that DHS has chosen to satisfy its perceived duty to respond under Section 1373.

[1] A "stay order is not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling on the merits*." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of stays); *see Allen v. Milligan*, 599 U.S. 1, 10 (2023) (affirming judgments despite initially staying preliminary injunctions pending appeal). Yet while the Supreme Court's "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

For four decades, SAVE has operated as a verification system designed to allow federal, state, and local agencies to confirm the citizenship or immigration status of individuals applying for public benefits. *Id.* at *1. For most of its existence, SAVE "consisted almost entirely of immigration records from DHS." *Id.* at *4 (Jackson, J. dissenting). In March 2025, Executive Order 14248 directed DHS to create a modified version of SAVE that retains SAVE's original purpose and structure, with two added capabilities: It now connects to the Social Security Administration's database of master social security files, and it permits bulk searches of multiple individuals. *Id.* at *1; *see also id.* at *4 (Jackson, J. dissenting). Critically, states or localities *must* initiate a request for verification of specified individuals' citizenship status in order to utilize Modified SAVE.

The State Citizenship Lists present a fundamentally different model, as contemplated by the 2026 Elections EO and approved in the Implementation Memo. While Modified SAVE is a reactive, per-voter verification tool that user states query on demand by identifying specific voters and receiving results that only verify the queried voters' citizenship, the State Citizenship Lists are an unprompted, DHS-compiled series of rosters of each state's entire adult U.S. citizen population with information other than citizenship status. The purpose of the Implementation Memo and effort to create State Citizenship Lists is to affirmatively "*compile and transmit* . . . to the chief election official of each State *a list* of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (the 'State Citizenship Lists')" "no fewer than 60 days before each regularly scheduled Federal election." Implementation Memo at 1, ECF 7-3 (emphases added); *accord id.* at 3. As described in the Implementation Memo approved by Secretary Mullin, each State Citizenship List is intended to be an unprompted master list of each state's adult U.S. citizen

residents that DHS will compile from across agency inputs and transmit to each State. And because State Citizenship Lists are state-specific, they necessarily include not just citizenship data but also state residency information—a data element entirely unrelated to citizenship or immigration status. *See id.* at 1–2.

## ARGUMENT

Section 1373 contains three subsections—(a), (b), and (c)—each of which the *LWV* Court briefly interpreted and applied solely with respect to the Modified SAVE system. The Court read Section 1373 as creating a statutory framework under which citizenship data must flow in an unrestricted manner *from* other government entities *to DHS* and a parallel obligation for DHS to *respond* to certain inquiries from state or local officials. *See LWV*, 2026 WL 2879700, at *2–3. Still, nothing in subsections (a), (b), or (c) authorizes or obligates DHS to disclose unprompted citizenship information to state election officials as required by both the 2026 EO and the Implementation Memo. And certainly nothing in these provisions authorizes DHS to collect or disseminate the breadth of data necessary to carry out the course of action adopted by the Implementation Memo. For each of the reasons discussed below, none of these subsections, nor the *LWV* Court's analysis of them, authorizes the Implementation Memo or the creation of State Citizenship Lists. Each reason provides an independent basis for granting Plaintiff summary judgment on Counts I-IV.

### I. Section 1373 does not authorize DHS to preemptively distribute citizenship information unprompted by a qualifying request for that information under Section 1373(c).

Section 1373 does not authorize DHS to preemptively disseminate information regarding citizenship unilaterally, without first receiving a qualifying verification request. The Supreme Court's decision in *LWV* does not suggest otherwise—in fact, it reinforces the point. For this reason alone, the Implementation Memo and State Citizenship List scheme it approves are outside the

scope of Section 1373 and unshielded by any authority conferred under *LWV*.

As explained, the Modified SAVE system only provides government agencies with citizenship verification of specified individuals upon submission of a request. *See supra* Background; *LWV*, 2026 WL 2879700, at *1 (describing Modified SAVE verification process, which begins when "a state or local agency seeking to determine an individual's citizenship status . . . uploads the individual's first name, last name, date of birth, or full or partial SSN to the SAVE portal"). In considering the legality of this system, the Supreme Court noted that "section 1373(c) requires DHS to *respond* to *inquiries* from state and local agencies '*seeking to verify or ascertain* the citizenship or immigration status of any individual.'" *LWV*, 2026 WL 2879700, at *3 (quoting 8 U.S.C. § 1373(c)) (emphases added).

The request-and-response nature of Modified SAVE, which was key to the *LWV* Court's reasoning and necessary to place Modified SAVE within the ambit of Section 1373(c), is absent here. The Implementation Memo's adopted course of action does not entail DHS responding to inquiries from state election officials. Rather, DHS is acting unilaterally to disseminate State Citizenship List data to states absent any qualifying request for citizenship verification under Section 1373. *See supra* Background. This alone shows that the Supreme Court's decision does not undermine—and in fact supports—EPIC's challenge to DHS's distribution of State Citizenship List data.

Section 1373's text confirms that the Supreme Court's analysis and EPIC's challenge to the dissemination of State Citizenship Lists are compatible. Under the Supreme Court's construction, Section 1373 creates a statutory framework under which citizenship data must flow in an unrestricted manner from other government entities *to DHS*.[2] But the flow of data *from DHS*

[2] EPIC maintains that the Supreme Court's stay-posture finding that Section 1373(a) "necessarily authorized DHS to request and receive" information regarding citizenship status, *LWV*, 2026 WL 2879700, at *2, is incorrect. *See, e.g.*,

to other government entities is more restricted—especially when it comes to information regarding U.S. citizens. Indeed, the only distribution of citizenship data authorized by Section 1373 is a (1) citizenship verification that DHS provides (2) in response to a proper Section 1373(c) inquiry (3) about specified individuals. To the extent that DHS distributes citizenship data in some other way, it would need to find authorization in some other statute (and comply with the disclosure restrictions of the Social Security Act and Privacy Act)—which it has not.

**Section 1373(a)** is, on its face, a prohibition directed at government entities *other than* DHS. It provides that "[n]otwithstanding any other . . . law," such entities may not be prohibited or restricted from "sending" citizenship information of any individual to, or "receiving" such information from, DHS. 8 U.S.C. § 1373(a). Perceiving that these government entities could find themselves in an "impossible predicament" arising from potential conflict between Section 1373(a)'s prohibition, on the one hand, and the disclosure restrictions of the Social Security Act and Privacy Act, on the other, the *LWV* Court concluded that "Congress necessarily authorized DHS to *request* and *receive* that information" and that this authority "likely supersedes" the disclosure restrictions of other statutes. 2026 WL 2879700, at *2 (emphasis added).

Notably, the Supreme Court did *not* find that Section 1373(a) authorizes DHS to *distribute* such information to other entities. This makes sense. Section 1373(a) is focused on regulating conduct of other government entities—not DHS. It does not provide that DHS must be free to disclose citizenship information to other agencies or the general public. In fact, it does not address DHS's authority or obligation to disclose citizenship information at all. It does not have to. As the

---

Plaintiff's Mem. Supp. Summ. J. ("MOL") at 18, ECF 7-1. Nonetheless, the Court need not reach this issue because EPIC would still prevail on each count for which it moved because DHS's collection of data from SSA and DOS, as laid out in the Implementation Memo, is not authorized even under the Supreme Court's construction. *See infra* Argument §§ II-III. And even if this data *collection* were authorized by the Supreme Court's preliminary construction of Section 1373, the *distribution* of this data to state officials, as laid out in the Implementation Memo, is itself sufficient basis for summary judgment on Counts I-IV.

*LWV* Court recognized, Section 1373(c) is the subsection of the statute that addresses the flow of citizenship information *from* DHS *to* other entities. Thus, unlike the government agencies for which the Supreme Court was concerned would be in a "bind" in *LWV*, DHS does not face the "impossible predicament" of being caught between obligations imposed by Section 1373(a) and the restrictions of the Social Security Act and Privacy Act. *LWV*, 2026 WL 2879700, at *2.[3]

**Section 1373(b)** provides that "[n]otwithstanding any other . . . law," government entities may not be prohibited or restricted from handling "immigration status" information of any individual in a number of ways, including: "[s]ending" it to DHS, "requesting" or "receiving" it from DHS, "[m]aintaining" it, or "[e]xchanging" it with other government entities. 8 U.S.C. § 1373(b). Unlike Sections 1373(a) and (c), which refer to "*citizenship* or immigration status" information, 8 U.S.C. §§ 1373(a), (c) (emphasis added), Section 1373(b) *only* refers to non-citizen "immigration status" information, *id.* § 1373(b). It therefore does not grant DHS authority to distribute information about *U.S. citizens*, and cannot be the source of authority for the dissemination of State Citizenship List data. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—[courts should] 'presume[]' that Congress intended a difference in meaning." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Notably, the scope of Section 1373(b), regarding the exchange of "immigration status" information, far exceeds that of Section 1373(a). Thus, while Section 1373(b) is not relevant to DHS's authority to disseminate State Citizenship Lists, it does show that the overarching statutory framework

---

[3] True, Section 1373(a) prohibits restrictions on government entities from "receiving" citizenship information from DHS. But, for the reasons stated, this does not separately authorize DHS to send information to other entities. Rather, this language prevents non-DHS government entities from barring themselves or others from accepting citizenship information properly sent to them by DHS. For example, a state law prohibiting state election officials from accepting citizenship information lawfully sent to them by DHS would likely violate Section 1373(a). This restriction, however, says nothing about what information DHS may lawfully send.

contemplates broader data protections for U.S. citizens.[4]

**Section 1373(c)** is the only provision of the statute that addresses the outflow of citizenship information *from* DHS *to* other agencies. It imposes an obligation that DHS "shall respond to [1] an inquiry by a Federal, State, or local government agency, [2] seeking to verify or ascertain the citizenship or immigration status [3] of any individual . . . by providing the requested verification or status information." 8 U.S.C. § 1373(c). Unlike the preceding provisions, Section 1373(c) does not include a "notwithstanding" clause, indicating that DHS's disclosure authority may be limited by other laws (such as the Social Security Act and Privacy Act). Nonetheless, the Supreme Court in *LWV* stated this provision should be "[c]onsidered alongside section 1373's 'notwithstanding' clauses," and that DHS's duty to respond to Section 1373(c) inquiries likely supersedes the restrictions of the Social Security Act and Privacy Act. 2026 WL 2879700, at *3.[5]

But even under the Supreme Court's construction, DHS's unilateral and unprompted provision of citizenship information is not authorized by Section 1373(c). Rather, as illustrated by the Supreme Court's consideration of the Modified SAVE system, DHS is authorized and

[4] Contrasting the prohibitions of Section 1373(b) with the silence of Section 1373(a) illustrates this point. Section 1373(b) *prohibits* restrictions on government requests for immigration-status information from DHS; Section 1373(a), however, *permits* restrictions on government requests for citizenship information about U.S. citizens from DHS. Likewise, Section 1373(b) *prohibits* restrictions on non-DHS agencies maintaining immigration-status information; Section 1373(a), however, *permits* restrictions on maintaining citizenship information about U.S. citizens. Finally, Section 1373(b) *prohibits* restrictions on non-DHS exchanges of immigration-status information between multiple federal and/or state government entities; Section 1373(a), however, *permits* restrictions on non-DHS exchanges of citizenship information about U.S. citizens. Thus, for example, consistent with the Supreme Court's construction of the statute, the Social Security Act and Privacy Act could impose restrictions on SSA exchanging citizenship information directly with non-DHS entities. Similarly, a federal or state law could impose restrictions on a non-DHS entity's authority to maintain a database (or list) of U.S. citizen information.

[5] EPIC maintains that the Supreme Court's stay-posture importation of a "notwithstanding" clause into Section 1373(c) is incorrect. Congress specifically omitted a "notwithstanding" clause from this provision after including it in the previous two. And "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—[courts should] 'presume[]' that Congress intended a difference in meaning." *Loughrin*, 573 U.S. at 358. Moreover, other elements of Section 1373(c) confirm that DHS's disclosure authority is limited. For example, inquiries by government agencies must be limited to persons "within the jurisdiction of the [inquiring] agency." 8 U.S.C. § 1373(c). And the inquiries must also be for a "purpose authorized by law." *Id.* Nonetheless, the Court need not reach this issue because, as explained above, the Implementation Memo is also inconsistent with the Supreme Court's stay-posture understanding of Section 1373(c).

obligated "to *respond* to *inquiries* from state and local agencies '*seeking to verify or ascertain* the citizenship or immigration status of any individual'" identified in that inquiry. *LWV*, 2026 WL 2879700, at *3 (emphasis added). This is not what DHS is doing here. DHS is not responding to Section 1373(c) inquiries by providing verification of citizenship for specified individuals. Indeed, it is not responding to any inquiry at all.[6] The unprompted, unilateral dissemination of State Citizenship List data is not authorized by Section 1373's plain text, and DHS's contrary reading improperly requires "treat[ing] statutory terms as surplusage." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned up). Because DHS's actions are not authorized by Section 1373, there is no basis for finding that the statute supersedes the protections of the Privacy Act and Social Security Act in this case, including the Privacy Act's requirement that DHS issue a System of Records Notice and conduct notice-and-comment for the new State Citizenship Portal system of records. *See* MOL at 10–15. For this reason alone, EPIC remains entitled to summary judgment on Counts I-IV.

## II. Section 1373 does not authorize the creation and dissemination of State Citizenship Lists because they are not about specified "individual[s]" for whom verification is sought.

Even under the Supreme Court's construction, Section 1373 does not authorize the course of action adopted by the Implementation Memo for an additional, independent reason: Any authority Section 1373 grants to DHS regarding the collection and dissemination of citizenship information is expressly limited to "information regarding the citizenship . . . of *any individual*." 8 U.S.C. § 1373(a) (emphasis added); *accord id*. § 1373(c) (requiring DHS to "respond to an

[6] A state logging into a portal and hitting a download button to obtain a pre-made list of purported U.S. citizens does not constitute an "inquiry . . . to verify or ascertain the citizenship or immigration status" of specified "individual[s]," nor does the government's transmission of the pre-made list constitute a "response" to such an inquiry under Section 1373(c). A SAVE query operates differently because it requires a user to *upload* a list of names (i.e., an "inquiry") to which DHS then "respond[s]" by verifying the citizenship of those specified individuals. 8 U.S.C. § 1373(c)

inquiry . . . seeking to verify or ascertain the citizenship . . . of *any individual* . . . by providing the requested verification" (emphasis added)).[7]

By including "any individual" in each of Section 1373's provisions, Congress necessarily limited the scope of the statute to information regarding specified persons. This language requires specific identification of the individuals about whom information will be exchanged, maintained, or distributed—and certainly does not permit wholesale treatment of citizenship information for all U.S. citizens. The import of this repeated language cannot be ignored. *See Bostock v. Clayton County., Georgia*, 590 U.S. 644, 658–660 (2020) (construing statute that "tells us three times . . . that our focus should be on individuals," explaining that the "consequences" of Congress's "focus on individuals rather than groups are anything but academic," and noting that "the meaning of 'individual'"—i.e., "'[a] particular being as distinguished from a class, species, or collection'"—is "uncontroversial"); *Merriam Webster's Collegiate Dictionary* 593 (10th ed. 1994) ("Individual" means "a particular being or thing as distinguished from a class, species, or collection[] as . . . a single human being as contrasted with a social group or institution" or "a particular person."); *Individual*, *Black's Law Dictionary* 773 (6th ed. 1990) ("Individual. As a noun, this term denotes a single person as distinguished from a group or class[.]"). Moreover, elsewhere in the IIRIRA, Congress used much broader language when discussing records concerning "*every* alien." *See* IIRIRA, Pub. L. No. 104-208, div. C, § 110, 110 Stat. 3009, 3009-558–559 (1996) (emphasis added) (amended 2000).

Any construction ignoring Section 1373's express limitation to records concerning "individual[s]" would "run[] afoul of the 'cardinal principle' of interpretation that courts 'must

---

[7] Section 1373(b) includes similar "any individual" language and, to the extent that the government contends it is somehow relevant here despite omitting any reference to "citizenship" status, this argument applies with equal force to that provision.

give effect, if possible, to every clause and word of a statute.'" *Loughrin*, 573 U.S. at 358 (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Indeed, a more expansive reading of Section 1373—i.e., one that contemplates the wholesale exchange of citizenship information for every adult U.S. citizen in every state—would read "any individual" entirely out of the statute. For example, in Section 1373(a): "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding ~~**the**~~ citizenship or immigration status, lawful or unlawful~~**, of any individual**~~."[8] Such a reading would also destroy the request-and-response structure of Section 1373(c). The very essence of DHS's duty under Section 1373(c), as recognized by the *LWV* Court, is to provide citizenship "verification" in response to inquiries seeking to verify the citizenship of "any individual."

*LWV* does not suggest a broader reading. There, the Supreme Court concluded that Section 1373 likely authorizes Modified SAVE, including its bulk-search functionality. But Modified SAVE *requires* the identification of specified individuals to run a bulk search. *See LWV*, 2026 WL 2879700, at *1 ("modified SAVE . . . allowed state and local authorities to conduct bulk searches of multiple *individuals* at once" (emphasis added)). Indeed, the Supreme Court made clear its understanding that any data sharing under Modified SAVE is predicated on the submission of a verification request that identifies specific individuals:

> Under the modified SAVE program, a state or local agency seeking to determine an *individual's* citizenship status first uploads the *individual's* first name, last name, date of birth, or full or partial SSN to the SAVE portal. The SAVE program automatically discloses that information to SSA, which runs it through its databases to find a match. SSA then discloses its search results to DHS, including the *individual's* full name, date of birth, full SSN, and citizenship status.

[8] Similarly, with regard to Section 1373(c): "[DHS] shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain ~~**the**~~ citizenship or immigration status ~~**of any individual within the jurisdiction of the agency**~~ for any purpose authorized by law, by providing the requested verification or status information."

> Finally, the SAVE portal returns a response to the agency, either confirming that the *individual* is a citizen or requesting that the agency resubmit its query with additional information. If the modified SAVE program is unable to confirm that an *individual* is a citizen, the agency is required to contact the *individual* and request that he provide proof of citizenship to register or remain registered to vote.

*LWV*, 2026 WL 2879700, at *1 (emphases added).

Unlike Modified SAVE, the Implementation Memo's adopted course of action is not individualized. The course of action does not entail the collection or distribution of data in response to individualized inquiries. It is not limited to a specified individual or specified individuals. Rather, it is wholesale by nature, meant to encompass the entire population of adult U.S. citizens and their state of residence. *See* Implementation Memo at 3, ECF 7-3 (describing each State Citizenship List as "a consolidated list of United States citizens and residents of the applicable State"). The language of Section 1373 cannot bear this load. And because Section 1373 does not authorize DHS's adopted course of action to collect, maintain, and distribute State Citizenship List data, the Supreme Court's decision in *LWV* does not impact EPIC's summary judgment motion. All four counts upon which EPIC moved (Counts I-IV) remain live, and the Court should grant summary judgment for the reasons laid out in the underlying briefing and at the hearing.

## III. Section 1373 does not authorize the creation and dissemination of State Citizenship Lists because they exceed the statute's limitation to information regarding "citizenship or immigration status."

### A. Section 1373's plain text confirms the State Citizenship Lists are outside its scope.

Section 1373 does not authorize the course of action adopted by the Implementation Memo for a third reason: State Citizenship List data exceeds the scope of the "citizenship or immigration status" information that Section 1373 authorizes DHS to collect, maintain, or distribute. The *LWV* Court found that Section 1373(a) authorizes DHS to request and receive "information regarding

the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *LWV*, 2026 WL 2879700, at *2. Similarly, Section 1373(c) requires DHS to respond to qualifying inquiries regarding "the citizenship or immigration status of any individual . . . by providing the requested verification or status information." 8 U.S.C. § 1373(c). Creation and dissemination of the State Citizenship Lists entails collection and dissemination of much more than just "information regarding citizenship or immigration status."

Courts have consistently construed this key phrase—"information regarding . . . citizenship or immigration status"—narrowly, finding that it is "a reference to a person's legal classification under federal law," and does not include personally identifiable information such as an individual's home address or contact information. *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019); *see also id.* ("[T]he United States argues that § 1373 actually applies to more information than just immigration status[.] . . . We disagree."); *City & County of San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022) ("Section 1373 only covers immigration-status information—*i.e.*, 'what one's immigration status is.'"); *United States v. City of Boston*, 833 F. Supp. 3d 30, 48 (D. Mass. 2026) (noting that prisoner "release date and time and limited personally identifying information[ ] falls squarely outside the ambit of § 1373"); *United States v. Illinois*, 796 F. Supp. 3d 494, 516–17 (N.D. Ill. 2025) (inmate "contact information, custody status, and release dates," do not constitute information "directly related to citizenship or immigration status" (collecting cases)).

But the State Citizenship Lists contemplated by the 2026 EO and approved in the Implementation Memo require compilation and dissemination of more than just immigration or citizenship status—they are lists of individuals "who maintain a residence in the subject State." *See* Implementation Memo at 1, ECF 7-3; Exec. Order No. 14399, § 2, 91 Fed. Reg. 17125, 17125

(Mar. 31, 2026). State residency data is fundamental to the administration's efforts to distribute State Citizenship Lists. The course of action adopted by the Implementation Memo cannot be accomplished without identifying and disaggregating citizens by state residency information, and therefore both the collection of state residency information from other agencies and the dissemination of state residency information to state election officials are necessary to the scheme. *See* Implementation Memo at 1, ECF 7-3 (implementing the "directive that DHS compile, maintain, and transmit State Citizenship Lists," requiring delivery of lists individually to "each state"); *see also* Exec. Order No. 14399, § 2, 91 Fed. Reg. at 17125 (commanding that DHS must "compile and transmit *to the chief election official of each State* a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and *who maintain a residence in the subject State* (State Citizenship List)" (emphasis added)).

State residency data plainly falls outside Section 1373's narrow authorization for the use of information "regarding . . . immigration or citizenship status," as state residency has nothing to do with citizenship or immigration status. *See Slaughter-House Cases*, 83 U.S. 36, 74 (1872) ("It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual."); *cf. Trump v. Barbara*, 146 S. Ct. 2438, 2456 (2026) (relying on *Slaughter-House Cases* to distinguish state citizenship from citizenship of the United States). The *LWV* Court did not suggest otherwise, and Modified SAVE does not entail disclosure of individuals' state residency information. *See LWV*, 2026 WL 2879700, at *1 (describing data elements disclosed through Modified SAVE). Because the State Citizenship Lists rely on—and

necessarily include—information that does *not* regard citizenship or immigration status, they are *not* covered by Section 1373's conferral of collection and distribution authority on DHS.[9]

### B. Agency practice and practical considerations confirm that Congress did not intend for DHS to collect, maintain, or disseminate state residency data, particularly in service of a voting integrity effort.

That Section 1373 does not authorize DHS to collect or transmit state residency information is evident not only from its plain text—but also from agency practice and related practical considerations. Neither DHS nor the agencies involved in compiling the State Citizenship Lists maintain residency or address information for the majority of United States citizens, and no such comprehensive database exists anywhere at the federal level. DHS may maintain (often outdated, inaccurate, or incomplete) address information for some non-citizens and immigrant citizens. But, consistent with its primary purview over immigration and naturalization, it does not maintain addresses or residency records as to the majority of American citizens at any point in time—let alone reliable, real-time residency information. Indeed, *no* federal agency maintains up-to-date state residency information. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 765 (2018) (describing unreliability of the USPS's National Change of Address Database because "according to the Postal Service '[a]s many as 40 percent of people who move do not inform the

---

[9] To the extent that the government argues for a broader construction—by, for example, asserting that the word "regarding" is capacious enough to sweep in effectively any information the government might compile on its citizens—this reading is foreclosed by the plain text of the statute. *See California*, 921 F.3d at 891–92 (rejecting overly broad interpretation of the word "regarding" in Section 1373, because "phrases like 'regarding' may generally have a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject, but if the term 'regarding' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally, relations stop nowhere." (cleaned up)); *Cf. N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) (similar regarding "relate to"), *abrogated on other grounds by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016). Moreover, "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *California*, 921 F.3d at 892 (citing 8 U.S.C. § 1360(a) ("mandating the inclusion of 'such other relevant information as the Attorney General shall require as an aid' to the creation of a central index of noncitizens entering the country") and 8 U.S.C. § 1360(b) ("Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to the Service upon request.")).

Postal Service'" (alteration in original)); Hill Decl. ¶ 23, ECF 7-2; *id.* Ex. Z at 2–3, ECF 7-28 (describing inaccuracy of IRS's address data).

This lack of any accurate state residency information at the federal level underscores that the correct interpretation of the statute is that Congress did not authorize DHS to share state residency data in that statute. And certainly Congress did not, in passing Section 1373, authorize the efforts at issue here: for DHS to compile and share *state residency information* for voting purposes.

The lack of accurate state residency information at the federal level also reflects the mobility of the modern world. Put simply: people move, and some people move near in time to elections—college students, snow birds, or any number of individuals who relocate to a new state for any reason. Consistent with this reality, Congress has mandated that no state can impose a residency requirement of longer than 30 days prior to election day, 52 U.S.C. § 10502(d), and many states permit voters to establish residency up until and including on election day.[10] Thus, no list that DHS compiles and transmits "no fewer than 60 days before each regularly scheduled Federal election" (or even 30, or 15 days before an election) could possibly include all states' residents for accurate voter verification purposes.

As noted, the federal government does not track up-to-date residency status generally, and it certainly has never attempted to do so with the degree of accuracy and timeliness that would be required to deploy that information for voter verification purposes. Rather, it is the purview of each individual state to verify its voters' residence consistent with each state's unique requirements

[10] For example, many states do not codify a minimum number of days required to establish residency for purposes of voting. *See*, *e.g.*, Haw. Rev. Stat. § 11-13 (Hawaii has no durational residency requirement); Iowa Code § 48A.5 (requiring only that the applicant "be an Iowa resident," with no specific day count codified); Me. Stat. tit. 21-a, §§ 112, 121-A (Maine defines voting residence by domicile and intent only without any durational requirement, and permits registration through Election Day).

and procedures. 52 U.S.C. § 10502. Thus, even to the extent that Congress intended to override the protections of the Privacy Act and Social Security Act in order to permit DHS officials to send and receive *citizenship and immigration status* information about individuals, it is implausible that Congress contemplated any such grant of authority to include other unenumerated categories of information that DHS neither maintains nor would be expected to possess in any reliable form.[11]

The harms that stem from inaccurate state residency data in a State Citizenship List underscore *why* the accuracy of data for its intended purpose is so critical: Here, the Implementation Memo describes transmission of state-specific data to the chief election official in *each state*, and it defers creating a system for an individual to correct his or her own data. Given the inaccuracy of the federal government's state residency data, the risk that an adult citizen does not end up on the correct list—i.e., the list to which the election officials in *that person's state* of residence has access, affirming their current residency *in that state*—is substantial. Congress could not have intended this result. *See*, *e.g.*, *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) ("frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act" (cleaned up)).

[11] Some agencies collect address information from time to time, but those records are generally snapshots of where the individual resided at the time they interacted with the agency. For example, DOS maintains records of U.S. citizens' addresses only to the extent that those citizens have applied for passports, and those addresses reflect only the applicants' addresses at the time of their passport application (note that passports for adults over 16 do not expire for ten years after issuance). *See* Privacy Act System of Records Notice, Passport Records, State-26, 80 Fed. Reg. 15653 (Mar. 24, 2015); 22 U.S.C. § 217a; 22 C.F.R. § 51.4. Where other agencies (uninvolved in the State Citizenship Lists) *do* maintain data regarding Americans' addresses and residency, Congress has tightly restricted those data sets. For example, census data is confidentiality-walled by statute, *see* 13 U.S.C. § 9; IRS information is restricted for tax purposes, *see* 26 U.S.C. § 6103.

**IV. The major questions doctrine confirms DHS's lack of statutory authority.**

A more expansive reading of Section 1373 than outlined above would not only defy the statute's plain text as construed in *LWV*, it would also run headfirst into the major questions doctrine. In the three decades since Section 1373's passage, DHS never before claimed that the statute granted it the authority to unilaterally create, maintain, and distribute a comprehensive master list of every adult U.S. citizen and their states of residence—and, as explained above, the Supreme Court's construction of Section 1373 does not give DHS any basis to do so now. By now claiming such authority, DHS has "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion [of its] . . . authority'" on matters of "vast . . . political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (first alteration in original). And DHS's plan to make lists of "verified" U.S. citizens in every state who are presumptively eligible to vote directly "intrudes into an area that is the particular domain of state law," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021)—i.e., assessing voter qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (determining voter qualifications "forms no part of the power to be conferred upon the national government"). The "lack of historical precedent" for DHS's actions, "coupled with the breadth of authority that [it] now claims, is a telling indication" that its adopted course of action "extends beyond [DHS's] legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam) (cleaned up); *see also* MOL at 20-21; Pl.'s Reply at 13, ECF 39.

**CONCLUSION**

Plaintiff's Motion for Partial Summary Judgment should be granted.

Dated: October 2, 2026

Respectfully submitted

*<u>/s/ Nikhel S. Sus</u>*
Nikhel S. Sus (Bar No. 31090)
John B. Hill*
Reuven Dashevsky*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
rdashevsky@citizensforethics.org

R. Orion Danjuma*
Julia L. Torti*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
orion.danjuma@protectdemocracy.org
jules.torti@protectdemocracy.org

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
(202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Jane Bentrott*
Shelby Teeter*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
jane.bentrott@protectdemocracy.org
shelby.teeter@protectdemocracy.org

John Davisson*
Mayu Tobin-Miyaji*
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, D.C. 20036
(202) 483-1140
davisson@epic.org
tobin-miyaji@epic.org

*Counsel for Plaintiff*

* Admitted *pro hac vice*